[No. S176983. Oct. 25, 2010.]

THE PEOPLE, Plaintiff and Appellant, v.
TERRION MARCUS ENGRAM, Defendant and Respondent.

1132

COUNSEL

Rod Pacheco, District Attorney, and Alan D. Tate, Deputy District Attorney, for Plaintiff and Appellant.

Susan S. Bauguess, under appointment by the Supreme Court, for Defendant and Respondent.

Gary Windom, Public Defender (Riverside) and William A. Meronek, Deputy Public Defender, for the Law Offices of the Riverside County Public Defender as Amicus Curiae on behalf of Defendant and Respondent.

OPINION

GEORGE, C. J.—In recent years, the Superior Court of Riverside County (hereafter Riverside Superior Court or Riverside court) has been severely overburdened by the substantial number of criminal cases awaiting trial in that county. The presumptive time period established by state law for bringing a felony case to trial is 60 days from the date a defendant is arraigned on an information or indictment. (Pen. Code, § 1382.) Nonetheless, a task force of experienced trial and appellate judges that was established specifically to assess and assist with the criminal case backlog in Riverside County reported in 2007: "Information from the Riverside County Sheriff's Department showed that nearly 25 percent of jail inmates had been awaiting trial for more than one year. One hundred seventy-seven inmates had been awaiting trial for more than two years, 32 inmates were awaiting trial for more than four years, and in one case the delay was an astonishing eight years." (Riverside Criminal Backlog Reduction Task Force, Rep. to Jud.

Council of Cal. (Aug. 1, 2008) p. 5 (Riverside Task Force Report) <http://www.courtinfo.ca.gov/jc/documents/reports/081508item10.pdf> [as of Oct. 25, 2010].)

To address this problem, numerous retired judges and active judges from outside the county—both as a part of, and in addition to, the task force—have been assigned by the Chief Justice to assist the Riverside Superior Court. (See Cal. Const., art. VI, § 6, subd. (e).) Furthermore, during the time period relevant to the present proceeding, the Riverside Superior Court itself devoted virtually all of its resources—superior court judges and courtrooms— ordinarily intended for the trial of civil cases instead to the trial of criminal cases, an effort that, at the time, seriously compromised that court's ability to conduct civil trials.

Notwithstanding the considerable preference that the Riverside Superior Court generally afforded the trial of criminal cases over civil cases, the District Attorney of Riverside County consistently has taken the position that a California statutory provision required the Riverside court to extend its efforts even further and make *every* superior court judge and courtroom— including the specialized superior court departments devoted to hearing and resolving family law, probate, and juvenile matters (as well as the judges from outside the county who had been assigned to that court specifically to assist with the backlog of long-delayed civil trials)—potentially available for the trial of any criminal case that was facing dismissal under the applicable California speedy-trial statutes. Although the district attorney's contention has been directly addressed and rejected in two published decisions of the appellate division of the Riverside court (*People v. Cole* (2008) 165 Cal.App.4th Supp. 1 [82 Cal.Rptr.3d 699] (*Cole*); *People v. Flores* (2009) 173 Cal.App.4th Supp. 9 [92 Cal.Rptr.3d 582] (*Flores*)), that official has continued to advance his claim in subsequent criminal proceedings at both the trial and the appellate level, and we therefore granted review to resolve the issue.

For the reasons discussed below, we conclude that the decisions in *Cole, supra,* 165 Cal.App.4th Supp. 1, and *Flores, supra,* 173 Cal.App.4th Supp. 9, correctly rejected the district attorney's contention. As we shall explain, the statute at issue—Penal Code section 1050[1]—has been in place for more than 80 years, and long ago this court expressly held that the provision's directive that criminal cases be given precedence over civil cases "is not of such an absolute and overriding character that the system of having separate departments for civil and criminal matters must be abandoned." (*People v. Osslo* (1958) 50 Cal.2d 75, 106 [323 P.2d 397] (*Osslo*).) Although a number of other decisions demonstrate that a superior court may run afoul of section 1050 if it shortchanges criminal matters and does not devote a reasonable

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

proportion of its resources to the trial of criminal cases (see, e.g., *People v. Echols* (1954) 125 Cal.App.2d 810 [271 P.2d 595] (*Echols*)), here it is clear that the Riverside Superior Court by no means has shortchanged criminal cases but, to the contrary, properly has provided considerable preference to the trial of those matters consistent with the general legislative policy embodied in section 1050. We conclude that the decisions in *Cole* and *Flores* correctly determined that the Riverside court did not violate section 1050 in declining to assign criminal cases to the limited number of trial court departments reserved for specialized civil matters or to the several judges from outside the county who had been assigned specifically to that court to assist in the trial of long-delayed civil matters.

The district attorney additionally contends that in the event we decide his interpretation of section 1050 is incorrect and that the trial court properly determined there was no available judge or courtroom to which the present criminal proceeding reasonably could have been assigned for trial within the presumptive period set forth in section 1382 (the applicable speedy-trial statute), the court nonetheless erred in dismissing the underlying criminal proceeding under that statute. The district attorney asserts that dismissal was improper because the trial court erred in determining that the lack of an available judge or courtroom did not constitute "good cause" under section 1382 to continue the trial to a later date.

We conclude that this contention similarly lacks merit. Past cases establish that when the lack of a judge or courtroom available to timely bring a criminal defendant to trial is fairly and reasonably attributable to the fault or neglect of the state, that circumstance does not constitute good cause to delay the defendant's trial for purposes of section 1382. (See, e.g., *People v. Johnson* (1980) 26 Cal.3d 557, 570–571 [162 Cal.Rptr. 431, 606 P.2d 738].) Here, the trial court reasonably could find that the lack of a number of judges sufficient to timely try the present case (and the 17 other criminal cases that were dismissed at the same time in the Riverside Superior Court) was fairly attributable to the state's failure, over a considerable period of time, to provide a number of judges sufficient to meet the needs of Riverside County's rapidly growing population and caseload—a circumstance fairly attributable to the fault or neglect of the state. Consequently, the trial court did not abuse its discretion in determining that good cause did not exist under section 1382 to continue the trial to a later date over defendant's objection.

Accordingly, we conclude that the judgment of the Court of Appeal, upholding the trial court's dismissal of this criminal proceeding, should be affirmed.

# I

## A

The relevant procedural facts leading to the dismissal of the underlying criminal charges are not in dispute.

Defendant Terrion Marcus Engram initially was charged with attempted premeditated murder (§§ 187, subd. (a), 664) and first degree burglary (§ 459). At defendant's first trial, the jury acquitted defendant of the attempted murder charge but found him guilty of burglary. On appeal, the Court of Appeal, concluding that the trial court committed prejudicial instructional error with regard to the burglary charge, reversed the conviction and remanded the matter to the trial court for a new trial on the burglary charge. (*People v. Engram* (July 23, 2007, E040549) [nonpub. opn.].) Although defendant spent a substantial period of time in custody prior to the Court of Appeal's reversal of his conviction, he was released from custody on his own recognizance pending retrial and remained free from custody throughout the subsequent proceedings.

The initial retrial of the burglary charge began on May 20, 2008. On May 27, 2008, after deliberating, the jury was unable to agree on a verdict and the trial court declared a mistrial. The trial court denied defendant's motion to dismiss the burglary charge, and set a new (third) jury trial on the burglary charges for July 14, 2008.

On that date, the prosecution moved to trail the trial to July 28, 2008, the last day for trial under the then governing time waiver executed by defendant, extended by the applicable 10-day grace period. In support of the motion, the assigned deputy district attorney stated, among other representations, that (1) "I have a last day case set for today," (2) "I also have two last day cases on July 21, 2008," (3) "I need time to prepare one of these cases as a hand-off for another Deputy District Attorney to try," and (4) "I need time to coordinate witness schedules." After trailing the matter for one day (because defendant was not present in court when the case was called on July 14), the trial court on July 15, 2008, without a waiver of time by defendant, granted the prosecution's motion to trail the matter to July 28, 2008.

On that date, defendant moved to continue the trial to August 28, 2008, based on his counsel's declaration that he was unable to complete discovery and investigation pending receipt of the trial transcripts from the second trial. The court granted the motion without objection by the prosecution and continued the trial to the date requested. At that time, counsel stipulated that the last day for trial under defendant's then applicable time waiver was September 8, 2008.

On August 28, 2008, the prosecution moved to continue the trial to September 8, 2008. A declaration filed by the deputy district attorney stated: (1) "I will be out of town the week of September 1–5, 2008," (2) "I recently finished trial" in another case, (3) "I have another case that has a current last day of September 8, 2008, and I need time to prepare this case as a 'hand off' for another Deputy District Attorney," and (4) "I need time to coordinate witness schedules and prepare for trial." The trial court, without a waiver of time by defendant, granted the motion and continued the trial to September 8.

On September 8, 2008, the prosecution again moved to continue the trial, this time until September 17, 2008. A declaration filed in support of the motion stated that although the deputy district attorney assigned to the case had expected to be available and able to proceed on September 8, that attorney still was out of the state and unavailable, attending to his brother who unexpectedly had contracted a staph infection and had been hospitalized. Without opposition by defendant, the trial court granted the motion and continued the trial to September 17. At that point, counsel for both parties stipulated that the last day for trial was September 29, 2008.

On September 11, 2008, the prosecution once again moved to trail the trial, this time from September 17 to September 29, 2008, the last day for trial under defendant's last time waiver. In an accompanying declaration signed by the assigned deputy district attorney, he stated that the prosecution was unable to proceed on September 17 because (1) "I will be out of town the week of September 15–18, 2008," (2) "I have two other cases that have a current last day of September 19, 2008 . . . and September 22, 2008," (3) "I need time to prepare this or the other two cases as a 'hand off' for another Deputy District Attorney," and (4) "I need time to coordinate witness schedules and prepare for trial." When the case was called on September 17, 2008, the trial court, without a waiver of time by defendant, granted the prosecution's motion to trail the trial until September 29. Counsel for both parties again stipulated that September 29 was the last day for trial.

When the case was called for trial on September 29, 2008, defense counsel announced he was ready for trial and that defendant objected to any further delay of trial. The supervising district attorney for the district attorney's office appeared for the prosecution and indicated he was there "for purposes of making any record at this point that needs to be made." The transcript of the trial court proceedings discloses that, in addition to the present case involving defendant Engram, there were 17 other "last-day" cases (one other felony case and 16 misdemeanor cases) that were before the court at the September 29 hearing, each of which presented a statutory speedy-trial issue similar to that presented by the *Engram* case. In each of the cases, after defense counsel announced ready for trial and stated that the defendant objected to any further

delay, the trial court informed counsel for both parties that there were no available courtrooms to which the case could be assigned for trial. In *Engram* and in each of the other cases, defense counsel informed the court that the defendant intended to move for a dismissal under section 1382 and requested the court to set a hearing the following day on the motion to dismiss.

The trial court stated to the supervising district attorney that, "much as . . . it grieves me to do it," the court tentatively was of the view that the law supported defense counsel's position that each of the cases should be set for a hearing the following day on the dismissal motions. The court inquired whether the district attorney wished to be heard on the matter.

The district attorney said that he did, and advanced two separate arguments opposing the setting of each case for a hearing on the defendant's motion for dismissal under section 1382.

First, although the court had indicated there were no available courtrooms to which the criminal cases at issue could be assigned for trial, the district attorney urged the court instead to use courtrooms currently devoted to juvenile, probate, and family law matters for the trial of criminal cases. In addition, the district attorney proposed that the court consolidate the number of so-called vertical calendar departments (VCD's) then in place in the Riverside Superior Court in order "to try a few more of these cases," or, alternatively, use "pro tem type judicial officers to sit on the VCD calendars so that courtrooms which do not now have judges could have the VCD or calendar judges sit in those departments to hear these criminal jury trials while the pro tem judges sit and oversee the calendar matters."

Second, the district attorney argued that "if the Court doesn't have sufficient resources to try these cases and the Court has done everything that the Court can do to find courtrooms for these cases, that should amount to good cause to continue each of these matters at least one day."

In responding to the supervising district attorney's comments, the court— after observing that "of course, we've had these conversations on other occasions"—initially inquired: "[C]ould any of the justice partners [(that is, the district attorney's office and the Riverside court)] prioritize[] these cases at an earlier phase and avoid[] some of this?" The supervising district attorney responded: "I absolutely believe . . . that the matters could be prioritized by the courts, and they could be prioritized by the District Attorney's Office."

The court then turned to the specific points that had been argued by the supervising district attorney. With respect to the proposal that, in addition to

utilizing all of the regular civil departments for the trial of criminal cases (as the court currently was doing), the court also should assign criminal cases for trial in the juvenile, probate, and family law departments, displacing the matters to which those specialized departments are devoted, the court stated: "Section 1050 of the Penal Code does not only authorize, but directs this Court to weigh out how to allocate [its] business in light of the social values that we must consider in administering a court. [¶] In juvenile court, that's a court where neglected and abused children as well as children who are accused of crime . . . get the attention of the court all to the aim of letting them grow up safely in decent surroundings and becoming productive citizens, rather than letting them go into the adult criminal law system. It would be an injustice to those children, to their parents[,] and to society to close down juvenile court in order to try other cases, important as these cases are. But whether it's 18, 17, or 19, we're dismissing a tremendous number of cases today. We will not be closing down juvenile court in order to squeeze out one or two more trials. On a practical note, they don't have jury boxes anyway."

The court continued: "With respect to probate, this is where . . . we deal with guardianship situations where we decide where children are to live when both parents are in prison or strung out on drugs or dead. These are important social issues and it's important to the welfare of children to keep probate open. Probate also deals with conservatorship, where retarded adults and other incompetent adults have their cases come up so they are cared for and that they don't live in misery or get exploited. And, again, there are huge human issues there that can't be neglected. Probate deals with the administration of estates and money issues, can be little, but when you're trying to figure out where the deceased person's money goes and administer cases such as that, again there are very great human issues there. Also, on a practical note, probate is handled by commissioners who would not be able to handle trials anyway."

The court then turned to the subject of the family law department. "Many of the family law courts are handled by commissioners. Those courtrooms don't have jury boxes. Again, we're dealing with child custody, child support issues of huge human and social importance. . . . [W]e will not be displa[c]ing family law or probate or juvenile."[2]

---

[2] Although at the September 29, 2008 hearing the trial court did not specifically describe the size of the caseload in the family, probate, or juvenile departments, in *Flores, supra*, 173 Cal.App.4th Supp. 9, the appellate court noted that at a similar hearing in that case the trial court had described the judges in these departments of the Riverside Superior Court as "burdened with heavy caseloads." (*Id.* at p. Supp. 24, fn. 10.) The trial court hearing in *Flores* took place on June 2, 2008 (*id.* at p. Supp. 12), just a few months before the trial court hearing in the

With respect to the supervising district attorney's suggestions relating to the VCD's, the court acknowledged that reasonable persons might differ regarding the optimal number of calendar departments that should be maintained, but the court emphasized that the calendar departments were crucial in obtaining the number of settlements that had been achieved and observed there would be "more dismissals, not less" if those departments were reduced. Further, the court explained that the use of commissioners or "pro tems" to free up VCD judges for trial would not be practical "because the essence of the VCD court is to settle cases where it can be done with justice to the victim, to society, and to the defendant," and "commissioners [and pro tems] no matter how skillful and intelligent don't have the . . . actual judicial power to cause settlements to occur."

Accordingly, the court rejected the supervising district attorney's objection to its determination that there were no available courtrooms to which any of the last-day criminal cases before the court could be assigned for trial.

Finally, in addressing the district attorney's argument "that if the Court lacked sufficient courtrooms to send these cases out today, that should be good cause under law to extend the deadline," the trial court pointed out that the then recent appellate division decision in *Cole, supra*, 165 Cal.App.4th Supp. 1, held that such circumstances do not constitute good cause to delay a trial for purposes of section 1382.[3] Although noting that, at that juncture, the time for this court to determine whether to grant review of the *Cole* decision had not yet expired, the trial court stated it agreed with *Cole* that the cases cited in that decision supported its holding.[4]

On the basis of the foregoing reasoning, the trial court rejected the prosecution's objection and set the *Engram* case for a hearing, to be held the following day, on defendant's motion to dismiss. (The court similarly set separate hearings for the following day on motions to dismiss each of the other 17 cases.)

On September 30, 2008, when defendant Engram and counsel for both parties appeared before the trial court, defense counsel moved to dismiss the

present case, and there was no showing here that the caseloads in those departments had decreased in the brief intervening time period.

[3] At the September 29, 2008 hearing, the trial court referred to the recent appellate division decision as the "*Gurdian* case." The *Gurdian* and *Cole* cases involved the same issue and were heard together and decided in a single published decision whose official citation is *People v. Cole, supra*, 165 Cal.App.4th Supp. 1. Accordingly, the trial court's reference was to the *Cole* decision, and to avoid confusion we shall refer to the case by that title.

[4] On October 22, 2008, a few weeks after the trial court's ruling in *Engram*, this court summarily denied a petition for review or for writ of mandate filed by the Riverside County District Attorney, challenging the decision in *Cole*. (*People v. Appellate Division of Superior Court* (*Cole and Gurdian*) (S166776, S166777).)

criminal proceeding pursuant to section 1382. The prosecution incorporated the argument it had made the previous day with regard to the defense motion to dismiss for lack of a courtroom, and indicated that if the matter was dismissed the People did not intend to refile the charges.[5] The trial court then dismissed the case due to the lack of a judge and a courtroom to timely try the case.

## B

The People, represented by the Riverside County District Attorney (district attorney), appealed from the dismissal of the action, contending that the trial court had erred in (1) declining to assign this criminal case for trial in one of the specialized courts—the juvenile, family law, or probate department—that then were hearing noncriminal matters, or, alternatively, (2) failing to find good cause under section 1382 to delay the trial beyond the presumptive statutory period.

In addressing the district attorney's initial argument that the trial court violated section 1050 by declining to assign this criminal case to one of the specialized civil departments, the Court of Appeal noted that the same issue had been raised and resolved against the district attorney not only in the appellate division decisions in *Cole, supra,* 165 Cal.App.4th Supp. 1 and *Flores, supra,* 173 Cal.App.4th Supp. 9, but also in the then recently decided Court of Appeal decision in *People v. Wagner,* review granted September 30, 2009, 100 Cal.Rptr.3d 448 [217 P.3d 817] (*Wagner*).[6] The Court of Appeal in *Engram* pointed out that in *Wagner* the district attorney maintained that the trial court (1) not only had erred in declining to assign criminal cases for trial in the juvenile, probate, or family law department, but (2) also had erred in declining to assign criminal cases for trial before three out-of-county judges who, in light of the Riverside Superior Court's overwhelming civil trial backlog, had been assigned to that court specifically to conduct civil trials in a temporary courtroom facility housed in Hawthorne Elementary School, where there was insufficient security to conduct criminal trials.

---

[5] Under section 1387, subdivision (a), when a felony proceeding is dismissed pursuant to section 1382, the prosecution ordinarily may refile the felony charge so long as it has not previously been dismissed. (See, e.g., *Crockett v. Superior Court* (1975) 14 Cal.3d 433, 437–438 [121 Cal.Rptr. 457, 535 P.2d 321].) In this case, the burglary charge had not previously been dismissed, and thus the prosecution retained the option of refiling the charge.

[6] We granted review of the published opinion in *Wagner* shortly after the Court of Appeal issued its unpublished opinion in *Engram* and before a petition for review was filed in the latter case. Because a factual circumstance in *Wagner* that was brought to this court's attention by the district attorney only after review had been granted in that case has rendered the People's appeal in *Wagner* moot, we have determined that *Engram* (rather than *Wagner*) should be treated as the lead case in resolving the legal issue presented here.

In agreeing with these prior decisions holding that the Riverside Superior Court did not violate section 1050 by taking the actions here contested by the district attorney, the Court of Appeal reiterated the following observation made by the court in *Flores*: "The record shows the Riverside Superior Court has already given extraordinary precedence to criminal trials over traditional civil matters, and still does not have the available resources to try all criminal cases in a timely fashion. [Citation.] The question then becomes whether giving *additional* precedence over both traditional and nontraditional civil matters would cause injustice." (*Flores, supra*, 173 Cal.App.4th Supp. 9, 23; original italics, fn. omitted.) Rejecting the district attorney's suggestion that the trial court had misunderstood the scope and extent of its authority in light of section 1050, the Court of Appeal stated: "The record reflects that [the trial court] considered every possible option, including assigning the case to special proceeding courtrooms, and concluded that in the interests of justice dismissal of the case was appropriate. Under such circumstances, 'and considering the balancing of societal interests inherent in section 1050, subdivision (a), we conclude the trial court did not abuse its discretion by refusing to use remaining noncriminal resources for [defendant's] trial.' [Citation.]"

The Court of Appeal then turned to the district attorney's alternative argument that the trial court erred in failing to find that good cause existed to continue defendant's trial beyond the time period set by section 1382. In support of his good-cause argument, the district attorney relied upon the decision in *People v. Yniquez* (1974) 42 Cal.App.3d Supp. 13 [116 Cal.Rptr. 626] (*Yniquez*), but the appellate court noted that the portion of the decision in *Yniquez* relied upon by the district attorney had been undermined by this court's subsequent decision in *People v. Johnson, supra*, 26 Cal.3d 557 (*Johnson*), which expressly questioned the decision in *Yniquez* insofar as that decision held that chronic court congestion properly should be viewed as constituting good cause to deny dismissal under section 1382. (*Johnson, supra*, 26 Cal.3d at pp. 570–571.) The Court of Appeal observed that *Johnson* and more recent decisions establish that " '[b]ecause the state has the obligation to provide sufficient resources to dispose of the usual court business promptly, court congestion will not constitute good cause unless the circumstances are exceptional.' " Although the district attorney maintained that this case should be viewed as an "exceptional circumstance" because of the trial court's asserted error in failing to assign the case for trial to one of the specialized civil departments, the Court of Appeal pointed out that it already had concluded that the trial court did not err in declining to assign this case to one of those departments, and further explained that the record made clear that here the lack of an available courtroom was the result of a *chronic* condition, and not an unusual, nonrecurring event. Accordingly, the Court of Appeal concluded that the trial court did not abuse its discretion in

determining there was not good cause to delay the trial beyond the time period set forth in section 1382, and affirmed the trial court's judgment dismissing the action pursuant to that statute.

The district attorney then sought review in this court, reiterating his staunchly held position that the lower courts' interpretation and application of section 1050 is erroneous, and that the trial court erred in dismissing the underlying criminal action pursuant to section 1382. We granted review to resolve the issues presented.

## II

We turn first to the district attorney's contention that the trial court violated the provisions of section 1050 granting precedence to criminal cases over civil cases when the court declined to assign the present case (or any of the other 17 last-day criminal cases then before the court) for trial in one of the specialized trial departments of the Riverside Superior Court that were devoted exclusively to the resolution of family law, probate, or juvenile matters, and that the Court of Appeal erred in upholding the trial court's action in this regard.

██ It is well established, in California and elsewhere, that a court has both the inherent authority and responsibility to fairly and efficiently administer all of the judicial proceedings that are pending before it, and that one important element of a court's inherent judicial authority in this regard is "the power . . . to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." (*Landis v. North American Co.* (1936) 299 U.S. 248, 254–255 [81 L.Ed. 153, 57 S.Ct. 163]; see, e.g., *Hays v. Superior Court* (1940) 16 Cal.2d 260, 264 [105 P.2d 975] ["There is nothing novel in the concept that a trial court has the power to exercise a reasonable control over all proceedings connected with the litigation before it. Such power necessarily exists as one of the inherent powers of the court and such power should be exercised by the courts in order to insure the orderly administration of justice."]; *Plachte v. Bancroft, Inc.* (N.Y.App.Div. 1957) 3 A.D.2d 437 [161 N.Y.S.2d 892, 893] ["It is ancient and undisputed law that courts have an inherent power over the control of their calendars, and the disposition of business before them, including the order in which disposition will be made of that business."].) As this court observed in *Brydonjack v. State Bar* (1929) 208 Cal. 439, 442 [281 P. 1018] (*Brydonjack*): "Our courts are set up by the Constitution without any special limitations; hence the courts have and should maintain vigorously all the inherent and implied powers necessary to properly and effectively function as a separate department in the scheme of our state government."

■ At the same time it recognized the constitutionally grounded inherent authority possessed by the judiciary, the court in *Brydonjack* explained that "this does not mean that the three departments of our government are not in many respects mutually dependent. Of necessity the judicial department as well as the executive must in most matters yield to the power of statutory enactments. [Citations.] The power of the legislature to regulate criminal and civil proceedings and appeals is undisputed." (*Brydonjack, supra,* 208 Cal. 439, 442–443.) Nonetheless, the court in *Brydonjack* emphasized that the separation-of-powers doctrine imposes a limitation on the Legislature's authority to promulgate rules affecting matters that fall within the inherent authority of courts, observing that "[t]he sum total of this matter is that the legislature may put reasonable restrictions upon constitutional functions of the courts provided they do not defeat or materially impair the exercise of those functions." (*Id.* at p. 444; see generally, e.g., *Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 52–66 [51 Cal.Rptr.2d 837, 913 P.2d 1046].)

A few years after the *Brydonjack* decision, this court, in *Lorraine v. McComb* (1934) 220 Cal. 753 [32 P.2d 960] (*Lorraine*), had occasion to address the interplay of legislative and judicial authority with respect to the calendaring and processing of pending judicial proceedings in considering the validity and proper interpretation of a recently enacted statutory provision declaring that "[i]n all cases, the court shall postpone a trial . . . for a period not to exceed thirty days, when all attorneys of record . . . agree in writing to such postponement." (Code Civ. Proc., former § 595, as amended by Stats. 1933, ch. 744, § 96, p. 1873.) In that case, on the date set by the trial court for trial of the underlying action, the parties through counsel agreed in writing to postpone the trial for two weeks, but the trial court refused to grant the requested postponement. When counsel did not proceed with the trial on the original date, the court ordered the matter to be placed on the list of "off calendar" cases, to be restored to the trial calendar at a future date in the manner required by the court's rules. The parties then sought a writ of mandate, challenging the action taken by the trial court.

■ In addressing the parties' contention, the court in *Lorraine* explained initially that "[t]he orderly and effective dispatch of legal business is the controlling factor with the court," and that although "[o]rdinarily it should be possible to accommodate the parties in cases where they mutually agree to a postponement of the trial date, . . . in case this becomes impracticable, the judicial control reposed in the court by the Constitution must prevail." (*Lorraine, supra,* 220 Cal. 753, 755.) In response to the parties' claim that the newly enacted statute (quoted above) eliminated the trial court's authority and discretion in this regard, the court in *Lorraine,* after citing *Brydonjack,* explained that if the statute in question were interpreted as imposing an

inflexible and obligatory restriction upon a court's authority, the constitutionality of the statute would be questionable. (*Lorraine*, at p. 756.) Quoting with approval from an out-of-state decision, the court in *Lorraine* observed: " '*One of the powers which has always been recognized as inherent in courts*, which are protected in their existence, their powers and jurisdiction by constitutional provisions, *has been the right to control its order of business and to so conduct the same that the rights of all suitors before them may be safeguarded.* This power has been recognized as judicial in nature, and as being a necessary appendage to a court organized to enforce rights and redress wrongs.' " (*Ibid.*, italics added, quoting *Riglander v. Star Co.* (N.Y.App.Div. 1904) 98 A.D. 101 [90 N.Y.S. 772], affd. (1905) 181 N.Y. 531 [73 N.E. 1131].)

In light of the inherent, constitutionally grounded authority conferred upon the courts to control the order of business before them, the court in *Lorraine* concluded that "[w]e cannot ascribe to the legislature the intent to make the action of the parties compulsory upon the court in each instance. [The statute's] provisions must be held directory[7] and on a par with such statutes as section 632 of the Code of Civil Procedure, which requires the court, on trial of a question of fact, to make and file its written decision within thirty days after submission of the cause to it; or section 634 of the Code of Civil Procedure which purports to require the trial judge to delay signing findings for five days after service of proposed findings . . . . [¶] In further illustration of the trend of the courts respecting statutes of this class could be cited a long list . . . such as section 57 of the Code of Civil Procedure, providing for preference on the calendars of appellate courts, of appeals in probate proceedings and contested election cases, or section 1264 of the Code of Civil Procedure, providing for preference on the calendar for trial of eminent domain cases." (*Lorraine, supra*, 220 Cal. at p. 757.)

Thus, the court in *Lorraine*—analogizing the statute before it to, among other legislative measures, various enactments providing for calendar preference—concluded that, in light of the constitutional limits imposed by the separation-of-powers doctrine upon legislative action that potentially impinges upon a court's inherent authority, the statute in question could not properly be interpreted as totally supplanting a court's discretion to control the order of business before it in order to protect and safeguard the rights and

---

[7] As explained in prior decisions, the term "directory," when used in reference to a statute, has been employed to denote different concepts—sometimes referring solely to the lack of (or limited type of) remedy prescribed when the statute is violated, and sometimes referring to whether a statute is simply "directive" or "permissive" rather than "obligatory," "compulsory," or "mandatory." (See, e.g., *Morris v. County of Marin* (1977) 18 Cal.3d 901, 908–909 & fn. 4 [136 Cal.Rptr. 251, 559 P.2d 606].) As the above quotation makes clear, the court in *Lorraine* employed the term "directory" in the latter sense—that is, to signify that the statute was to be construed as simply directive or permissive, rather than "compulsory."

interests of all litigants with matters before the court, and to promote the fair and efficient administration of justice.

The case of *Thurmond v. Superior Court* (1967) 66 Cal.2d 836 [59 Cal.Rptr. 273, 427 P.2d 985] (*Thurmond*) further illustrates the applicable general legal principles governing the issue before us. In *Thurmond*, this court considered the proper interpretation and application of two statutes providing that the trial of any proceeding or the hearing of any motion "shall be postponed" when any attorney of record is a member of the Legislature and the Legislature is in session, and further providing that, absent the consent of the participating legislator/attorney, the proceeding shall not "be brought on for trial or hearing before the expiration of thirty (30) days next following final adjournment of the Legislature." (Code Civ. Proc., § 595; see *id.*, § 1054.1.) In *Thurmond*, in the underlying paternity action, a prospective mother's guardian ad litem had sought an order requiring the alleged father to pay for the medical expenses and support of the expected child during the pendency of the paternity action, but one day prior to the scheduled hearing, a legislator appeared as attorney of record for the alleged father and, citing the relevant statutes, sought and obtained a lengthy postponement of the hearing. The guardian ad litem then sought a writ of mandate to compel the trial court to set an early hearing on the request for medical expenses and support.

Relying upon the decision in *Lorraine, supra*, 220 Cal. 753, this court concluded in *Thurmond* "that the statutory provisions upon which [the alleged father] relies should be viewed as directory only." (*Thurmond, supra*, 66 Cal.2d 836, 838–839.) After quoting the passage from *Lorraine* emphasizing the inherent power of courts " 'to control [their] order of business and to so conduct the same that the rights of all suitors before them may be safeguarded' " (*Thurmond*, at p. 839), the court in *Thurmond* noted that "[t]he guardian in the present case points out that the right of the mother and child to apply for relief pendente lite will be materially impaired and perhaps destroyed by the imposition of any substantial continuance; neither the birth of the child nor its need for care and support can be postponed. A similar result could follow in other cases in which a party has a right to invoke a provisional remedy, such as pendente lite support in domestic relations controversies, attachment and sale of perishable goods, receivership of a failing business, and temporary restraining orders or preliminary injunctions. [Citation.] Situations other than those involving provisional remedies may also arise in which a substantial existing right would be defeated or abridged by extended continuances." (*Thurmond, supra*, 66 Cal.2d 836, 839.)

After noting these numerous instances in which an inflexible application of the statute could lead to obviously unjust consequences, the court in *Thurmond* concluded: "We are convinced that such a result, with the serious constitutional questions which would ensue, was not intended by the Legislature, and

that *the statutory provisions here involved are to be applied subject to the discretion of the court as to whether or not its process and order of business should be delayed.*" (*Thurmond, supra,* 66 Cal.2d 836, 839–840, italics added.) Thus, the court in *Thurmond* did not hold that the statutory provisions in question were invalid on their face or were to be totally disregarded, but rather concluded that the statutes should be applied in a manner that accorded reasonable discretion to the court to safeguard the interests of all those before the court. The court explained in this regard: "The legislative policy of granting continuances of court proceedings so as not to interfere unduly with the functions of the Legislature, reflected in section 595, has been in the law since 1880 and should be given full force and effect wherever and whenever it may be done without unduly adversely affecting the rights of others." (*Id.* at p. 840; see also *Pham v. Nguyen* (1997) 54 Cal.App.4th 11, 15–16 [62 Cal.Rptr.2d 422] [discussing proper application of Code Civ. Proc., § 595.2— the statutory successor to the provision addressed in *Lorraine, supra,* 220 Cal. 753, and explaining that "even though section 595.2 is directory, we would encourage trial courts—as the *Lorraine* court itself indicated—to 'accommodate' counsel whenever it is not 'impractical' to do so"].)

As we shall see, the general principles underlying the decisions in *Lorraine, supra,* 220 Cal. 753, and *Thurmond, supra,* 66 Cal.2d 836, inform the proper interpretation and application of the relevant provisions of section 1050, subdivision (a), the statutory provision at issue in the present case.

Section 1050, subdivision (a) currently reads in full: "The welfare of the people of the State of California requires that all proceedings in criminal cases shall be set for trial and heard and determined at the earliest possible time. To this end, the Legislature finds that the criminal courts are becoming increasingly congested with resulting adverse consequences to the welfare of the people and the defendant. Excessive continuances contribute substantially to this congestion and cause substantial hardship to victims and other witnesses. Continuances also lead to longer periods of presentence confinement for those defendants in custody and the concomitant overcrowding and increased expenses of local jails. It is therefore recognized that the people, the defendant, and the victims and other witnesses have the right to an expeditious disposition, and to that end it shall be the duty of all courts and judicial officers and of all counsel, both for the prosecution and the defense, to expedite these proceedings to the greatest degree that is consistent with the ends of justice. *In accordance with this policy, criminal cases shall be given precedence over, and set for trial and heard without regard to the pendency of, any civil matters or proceedings.* In further accordance with this policy, death penalty cases in which both the prosecution and the defense have informed the court that they are prepared to proceed to trial shall be given precedence over, and set for trial and heard without regard to the pendency

of, other criminal cases and any civil matters or proceedings, unless the court finds in the interest of justice that it is not appropriate." (Italics added.)

◼ Although section 1050, subdivision (a), sets forth a general legislative policy that criminal cases shall be granted precedence over civil cases, as the language of the italicized sentence itself indicates, the statute explicitly declares that such precedence is to be applied "[*i*]*n accordance with*" the policy set forth in the preceding sentence, that is, in accordance with the policy of expediting criminal cases "to the greatest degree *that is consistent with the ends of justice.*" (§ 1050, subd. (a), italics added.) Because the statute explicitly recognizes a court's fundamental and overriding obligation to administer the proceedings that are pending before it in a manner that is consistent with the ends of justice, past decisions have recognized that the provision cannot properly be interpreted as establishing an absolute or inflexible rule mandating such precedence under all circumstances or in total abrogation of a trial court's ultimate control or discretion over the order in which the cases pending before it should be considered. (See, e.g., *People v. McFarland* (1962) 209 Cal.App.2d 772, 777 [26 Cal.Rptr. 596] ["the purposes to be achieved [by the statute] expressly are subservient to the 'ends of justice' "].)[8]

◼ Indeed, when the extremely wide spectrum of cases falling within the respective "criminal" and "civil" categories is taken into consideration, it clearly appears that the statutory language in question cannot reasonably be

---

[8] From section 1050's inception, numerous cases have stated that this statute is "directory," but these cases generally have used the term "directory" to refer to the circumstance that the statute does not specify a remedy for a violation of its provisions (see, *ante,* at p. 1148, fn. 7) and accordingly have found that a failure to comply with a particular directive set forth in section 1050 does not, in itself, require dismissal of a criminal proceeding. (See, e.g., *Ray v. Superior Court* (1929) 208 Cal. 357, 359 [281 P. 391] [failure to bring case to trial within 30 days of entry of plea—as § 1050 originally provided (see, *post,* at p. 1152, fn. 9)—does not require dismissal]; *People v. Marshall* (1930) 209 Cal. 540, 546 [289 P. 629] [same]; *Malengo v. Municipal Court* (1961) 56 Cal.2d 813, 816 [17 Cal.Rptr. 10, 366 P.2d 453] [prosecution's failure to establish that continuance of trial was required by ends of justice does not require dismissal].) Section 1050, subdivision (*l*)—enacted in 2003—codifies these judicial rulings, stating that "[t]his section is directory only and does not mandate dismissal of an action by its terms."

Because the numerous judicial decisions characterizing section 1050 as "directory" were concerned primarily with the remedy, or lack thereof, to be imposed for noncompliance with the statute's requirements, and did not involve the question whether the sentence in section 1050 granting precedence to criminal cases over civil cases is properly interpreted as merely directive rather than compulsory, those decisions are not directly in point with regard to the issue before us in this case. Nonetheless, as explained in the text, both the relevant language of section 1050, subdivision (a), itself, and the governing decision of this court that does address the effect of section 1050's provisions granting precedence to criminal cases, establish that this aspect of the statute was not intended, and should not be interpreted, to eliminate a trial court's ultimate discretion to depart from the general legislative policy granting calendar precedence to criminal matters when the court concludes that the "ends of justice" require such a departure.

interpreted as intended to establish an absolute, inflexible command that criminal cases be granted precedence over civil proceedings in any and all circumstances. Criminal cases, of course, run the gamut from serious felony charges involving multiple murder and other violent offenses to minor misdemeanor cases involving much less serious charges; similarly, civil cases encompass not only what might be characterized as run-of-the-mill slip-and-fall personal injury cases or routine breach-of-contract actions, but also, for example, proceedings contesting the temporary or permanent custody of young children, actions to obtain injunctive relief or keep-away orders intended to protect the asserted victims of domestic violence or stalking, cases seeking the civil commitment of alleged sexually violent predators, or proceedings challenging the attempted eviction of families from their homes. Just as this court found in *Thurmond, supra*, 66 Cal.2d 836, that the statutory provision at issue in that case could not properly be applied so as to entirely deprive a court of discretion to protect the interests of all persons before the court, we conclude that the relevant provisions of section 1050 cannot properly be interpreted to strip a trial court of the ultimate control over the cases within its jurisdiction so as, for example, to compel the court to postpone or totally forgo consideration of an urgent or extremely important civil proceeding in which time is of the essence in order to make way for the trial of a relatively less serious criminal matter. Furthermore, particularly in light of the constitutional separation-of-powers considerations set forth in the decisions in *Lorraine, supra*, 220 Cal. 753, and *Thurmond, supra*, 66 Cal.2d 836, we find it abundantly clear that the provisions of section 1050 cannot properly be interpreted to require a trial court completely to forgo or abandon consideration of *all* civil cases or proceedings over an extended period of time when the number of criminal cases filed and pursued to trial continually overwhelms the resources available to the court for the disposition of both criminal and civil matters.[9]

---

[9] The history of section 1050 supports the conclusion that the Legislature did not contemplate that this statute would require a trial court to completely abandon the processing of civil cases pending before the court when faced with a congested criminal calendar.

Section 1050 was initially enacted in 1927. (Stats. 1927, ch. 600, § 1, p. 1036.) Prior to that time, former section 1052 provided that "[w]hen an action is called for trial, or at any time previous thereto, the Court may, upon sufficient cause, direct the trial to be postponed to another day." (Code Amends. 1880, ch. 47, § 61, p. 20.) The 1927 legislation repealed former section 1052 (Stats. 1927, ch. 600, § 2, p. 1036) and enacted in its place section 1050, which then read in full: "The court shall set all criminal cases for trial for a date not later than thirty days after the date of entry of the plea of the defendant. No continuance of the trial shall be granted except upon affirmative proof in open court, upon reasonable notice, that the ends of justice require a continuance. No continuance shall be granted for any longer time than it is affirmatively proved the ends of justice require. Whenever any continuance is granted, the court shall enter in its minutes the facts proved which require the continuance. *Criminal cases shall be given precedence over civil matters and proceedings. If any court is unable to hear all*

Indeed, in the present case the district attorney does not argue that section 1050 should be construed to eliminate all trial court discretion over the calendaring of civil versus criminal matters. In the briefs filed in this court, the district attorney maintains he "has never asserted or argued that criminal matters should take precedence over *all* civil matters or proceedings" and "has never sought to 'shut-down' the family law or probate departments, or any other non-criminal departments handling civil trials." Instead, the district attorney argues that "there should be no judges or courtrooms in Riverside

*criminal cases pending before it within thirty days after the respective defendants have entered their pleas, it must immediately notify the chairman of the judicial council.*" (Stats. 1927, ch. 600, § 1, p. 1036, italics added.)

Thus, as initially enacted, the portion of section 1050 stating that criminal cases should be given precedence over civil matters and proceedings was followed immediately by a sentence providing that if any court was unable to hear all criminal cases pending before it within the period set forth in the statute for bringing criminal cases to trial, the court "must immediately notify the chairman of the judicial council." Although the statute did not spell out the reason for this notification requirement, the explanation is readily ascertainable.

One year earlier, in 1926, a new provision—then denominated article VI, section 1a—had been added to the California Constitution, establishing the Judicial Council and designating the Chief Justice of California as the Chairman of the Judicial Council. In addition to setting forth the administrative authority and duties of the Judicial Council, the new constitutional section provided that "[t]he chairman [of the Judicial Council] shall seek to expedite judicial business and to equalize the work of the judges, and *shall provide for the assignment of any judge to another court* of a like or higher jurisdiction *to assist a court or judge whose calendar is congested*, to act for a judge who is disqualified or unable to act, or to sit and hold court where a vacancy in the office of judge has occurred." (Cal. Const., art. VI, former § 1a, italics added.) Accordingly, although section 1050, as initially enacted, declared that criminal cases should be given precedence over civil cases, it appears reasonably clear the statute did not contemplate that a trial court finding itself unable to bring criminal cases pending before it to trial within the statutorily prescribed time period would be required to suspend or entirely abandon consideration of all civil cases pending before the court, but rather intended that the court would notify the Chairman of the Judicial Council who then would assign one or more out-of-county judges to the overburdened court to remedy the court congestion.

Although, as a result of numerous amendments to section 1050 over its lengthy existence, the required notification to the Chairman (now Chair) of the Judicial Council no longer appears immediately adjacent to the sentence in section 1050, subdivision (a) that calls for the granting of precedence to criminal cases over civil cases, the notification requirement remains an integral part of section 1050. Section 1050, subdivision (j) explicitly provides in this regard that "[w]henever it shall appear that any court may be required, because of the condition of its calendar, to dismiss an action pursuant to Section 1382, the court must immediately notify the Chair of the Judicial Council." And, under the relevant provision of the California Constitution (now art. VI, § 6, subd. (e)), the Chair of the Judicial Council retains authority to assign additional judges to an overburdened court "to expedite judicial business and to equalize the work of judges."

Accordingly, the history of section 1050 demonstrates that the remedy contemplated by the statute when a trial court finds it may be required to dismiss a criminal proceeding because of the congested condition of its calendar is the assignment of additional judges to assist the court, and not the trial court's abandonment of its inherent and fundamental responsibility and authority to ensure that its judicial resources are utilized to promote the fair administration of justice in all of the matters pending before it, civil and criminal.

County that are completely excluded from being considered or utilized for a last day criminal trial matter," maintaining that the trial court in the present case erred in failing to examine the specific charges and circumstances of the *Engram* matter (and of each of the other 17 criminal cases before it) as well as the specific facts of each of the matters then pending in the family law, probate, and juvenile departments in order to determine whether a *particular* criminal case should take precedence over a *particular* civil matter pending in those departments. Thus, the district attorney faults the superior court for adopting and applying a general policy under which the family law, probate, and juvenile departments of the superior court were reserved for the resolution of matters falling within the specialized jurisdiction of each department.

 Contrary to the district attorney's contention, however, past cases establish that section 1050 does not preclude a trial court—in implementing an efficient and cost-effective system for organizing and administering the processing of the many diverse matters pending before it—from designating separate departments to handle criminal and civil matters and, within reasonable limitations, assigning cases for trial only within the appropriate department.

The leading case on point is this court's decision in *Osslo, supra,* 50 Cal.2d 75. In *Osslo,* the defendants contended that the trial court violated the provisions of former section 681a[10] and section 1050 by postponing the commencement of their criminal trial while civil cases were sent out to trial in separate civil departments of that court. In *Osslo,* the court explicitly rejected this contention, declaring: "It does not appear that the policy of sections 681a and 1050 was disregarded. [The trial court's] explanation of the condition of the calendar shows that defendants were not being deprived of precedence over civil cases for any arbitrary reason and that the continuances to enable trial in Department 4 [(the presiding criminal department)] were not made for the purpose of improperly channeling the case into that department. Rather, it appears that the orderly administration of a crowded calendar required the continuances to enable trial of the case in a proper department. *The precedence to which criminal cases are entitled is not of such an absolute and overriding character that the system of having separate departments for civil and criminal matters must be abandoned.*" (*Osslo,* at p. 106, italics added.) (See also *People v. Weiss* (1958) 50 Cal.2d 535, 558 [327 P.2d

---

[10] At the time of *Osslo,* former section 681a provided: "The welfare of the people of the state of California requires that all proceedings in criminal cases shall be heard and determined at the earliest possible time. It shall be the duty of all courts and judicial officers and of all district attorneys to expedite the hearing and determination of all such cases and proceedings to the greatest degree that is consistent with the ends of justice." (Stats. 1927, ch. 618, § 1, p. 1045.) In 1959, former section 681a was repealed and its provisions were incorporated into section 1050. (Stats. 1959, ch. 1693, §§ 1, 2, p. 4092.) The language of former section 681a now is contained within section 1050, subdivision (a). (See, *ante,* at pp. 1150–1151.)

527] [relying upon *Osslo* for the principle that a trial court, in setting or continuing criminal trials, may implement policies that further "the orderly administration of justice"].) Nothing in *Osslo* suggests that the trial court was required to examine the specific facts of the particular civil cases that were sent out to trial before retaining the criminal proceeding for trial in a criminal department.

Thereafter, in *People v. McFarland, supra*, 209 Cal.App.2d 772, the court relied upon *Osslo, supra*, 50 Cal.2d 75, in rejecting the defendant's contention that the trial court, in finding good cause to continue the defendant's criminal trial beyond the 60-day period based upon the circumstance that a codefendant's counsel was engaged in a civil trial, had violated section 1050 by effectively giving precedence to a civil case over a criminal trial. In concluding that the trial court's action did not violate the provisions of that statute, the court in *McFarland* stated: "The provisions [of section 1050] relied upon merely establish a policy (*People v. Tenedor* [(1951)] 107 Cal.App.2d 581, 583 [237 P.2d 679]); are not absolute (*People v. Osslo*, [*supra,*] 50 Cal.2d 75, 106 . . .); and do not require that criminal proceedings be given precedence over civil proceedings regardless of the circumstances. (*People v. Osslo, supra*, 50 Cal.2d 75, 106.) Collaterally the provisions of section 681a of the Penal Code declare a policy that 'criminal cases shall be heard and determined at the earliest possible time,' and impose a duty upon the courts, judicial officers and district attorneys 'to expedite the hearing and determination of all such cases and proceedings to the greatest degree that is consistent with the ends of justice.' It is obvious that these provisions do not impose an arbitrary standard because the purposes to be achieved expressly are subservient to the 'ends of justice.' " (*McFarland*, at p. 777; see also *People v. Carlson* (1977) 76 Cal.App.3d 112, 114–115 [142 Cal.Rptr. 638].)

Thus, contrary to the district attorney's contention, this court's decision in *Osslo, supra*, 50 Cal.2d 75, and the cases following that decision, establish that section 1050 does not preclude a trial court from creating separate criminal and civil departments, establishing a general policy under which cases or proceedings are assigned to an appropriate department for trial, and thereafter generally retaining cases for trial within the appropriate department. Accordingly, under *Osslo*, the trial court in the present case did not violate section 1050 simply because it declined to assign the present case for trial in one of the specialized departments reserved for the disposition of family law, probate, or juvenile matters without considering the specific facts or circumstances of the individual cases that were then pending in each of those departments. Indeed, interpreting section 1050 as restricting a court's discretion in this area only to undertaking a case-by-case comparison of each pending criminal and civil case—as argued by the district attorney, in essence—would greatly increase the administrative burdens upon the court,

predictably resulting in even greater court congestion and delay in a chronically overtaxed court. There is no sound basis for construing the statute in a manner that impedes the flexibility needed to facilitate the fair, effective, and efficient administration of justice of all matters pending before the court. (Accord, e.g., *People v. Najera* (1979) 88 Cal.App.3d 930, 933, 934 [152 Cal.Rptr. 124] [rejecting claim that constitutional provision authorizing the assignment of a judge to another court permitted only the assignment of an individual judge by name, and upholding validity of "blanket" assignment of all L.A. County Municipal Court judges to sit as L.A. County Superior Court judges for a designated period of time, emphasizing that "[f]lexibility in administration on a day-to-day basis is needed and permitted . . ."]; *People v. Swain* (1995) 33 Cal.App.4th 499, 503–504 [39 Cal.Rptr.2d 422] [same].)

■ Although this court's decision in *Osslo* establishes that the precedence to which criminal cases are entitled under section 1050 does not require that "the system of having separate departments for civil and criminal matters must be abandoned" (*Osslo, supra,* 50 Cal.2d 75, 106), at the same time a number of Court of Appeal decisions demonstrate that a trial court's authority to designate and maintain separate civil and criminal departments is not without limits. These appellate decisions recognize that the section 1050 directive granting criminal cases precedence over civil cases generally has been interpreted to require a trial court to organize its civil and criminal departments and workload in a manner that (1) acknowledges the important state interest in the expeditious resolution of criminal proceedings as reflected in section 1050, and (2) does not shortchange the court's criminal caseload by creating or maintaining a disproportionately large number of civil as compared to criminal departments.

■ The case of *Echols, supra,* 125 Cal.App.2d 810 demonstrates this point. In *Echols,* although the defendants were in custody and had announced they were ready for trial and objected to any delay beyond the presumptive statutory period for bringing the case to trial, the trial court found good cause to continue trial beyond the statutory period on numerous occasions, based solely upon the circumstance that *in the particular criminal trial department to which the defendants' case initially had been assigned* there were older cases that were then in trial or that were scheduled for trial prior to the defendants' case. In concluding that the trial court erred in delaying the defendants' trial on this basis, the court in *Echols* observed: "The San Francisco Superior Court had 22 regular departments and one extra sessions department. No showing was made at any time why this case could not have been tried in one of the other criminal departments. Assuming, without a showing to that effect, that they were all busy, no reason was given why the case could not have been assigned to one of the many civil departments. . . . *We are informed that of the 23 departments only four try criminal cases (not counting the juvenile court which also tries certain types of criminal cases).*

*Apparently, this is approximately the same number of criminal departments San Francisco had when its total departments numbered only 16. . . .* [¶] With 23 departments to choose from, in order to protect the fundamental rights of persons charged with crime more departments could be assigned criminal cases." (125 Cal.App.2d at pp. 815–816, italics added.) Emphasizing that "[n]o judge has an inherent right to try any particular case nor to refuse to transfer cases out of his department" (*id.* at p. 817), the court in *Echols* reversed the trial court's determination that the delay of the defendants' trial was supported by good cause.

In *Stewart v. Superior Court* (1955) 132 Cal.App.2d 536 [282 P.2d 582] (*Stewart*), the appellate court reached a similar conclusion. In setting forth the relevant facts in that case, the court in *Stewart* stated: "In an affidavit of petitioner's counsel filed with the petition it is stated on information and belief that on March 3 and 4 [(the days on which the commencement of defendant's trial was continued by the trial court on the basis of a congested calendar)] only 8 of the 59 judges of the [Los Angeles] superior court presiding at the county seat were assigned to departments for the trial of criminal cases and that on those dates 29 civil cases were assigned for trial to the civil departments of the court. These statements are not denied by respondent [superior court]. This procedure, of course, was contrary to the requirements of section 1050 of the Penal Code: 'Criminal cases shall be given precedence over all civil matters and proceedings.' " (*Stewart v. Superior Court* (1955) 132 Cal.App.2d at p. 538; see also *Dearth v. Superior Court* (1940) 40 Cal.App.2d 56, 59 [104 P.2d 376] (*Dearth*) ["To comply with the provision contained in section 1050 of the Penal Code that criminal matters should be given precedence over civil matters . . . , a greater number of judges should have been assigned to departments handling criminal matters. There are fifty judges in the Superior Court of Los Angeles County, and the showing that a large number of civil cases were pending does not excuse the failure to assign a sufficient number of judges to handle criminal matters."].)

Unlike the circumstances in *Echols, supra,* 125 Cal.App.2d 810, *Stewart, supra,* 132 Cal.App.2d 536, *Dearth, supra,* 40 Cal.App.2d 56, and similar cases, the record in this case and the records in the recent cases of *Cole, supra,* 165 Cal.App.4th Supp. 1, and *Flores, supra,* 173 Cal.App.4th Supp. 9, make clear that the Riverside Superior Court by no means shortchanged criminal cases by reserving an unreasonably high number or proportion of judges or courtrooms exclusively for the trial of civil matters. On the contrary, during the period of time relevant to all of these matters, the Riverside Superior Court continually granted substantial precedence to criminal cases over civil cases, utilizing virtually all of the court's ordinary civil department judges and courtrooms for the trial of criminal cases. Furthermore, official records establish that the Chair of the Judicial Council was well aware of the very

serious backlog of criminal cases pending in the Riverside Superior Court and that, during the period covered by this case and the *Cole* and *Flores* decisions, an unprecedented 28-judge strike force of retired and out-of-county active judges was assigned to the Riverside Superior Court by the Chair of the Judicial Council to assist in the trial and disposition of criminal cases. (See Riverside Task Force Rep., *supra*, at p. 7.)

 In its official report issued in August 2008—just shortly before the proceedings at issue in this case took place—the task force explained: "[B]ecause of the recurrence of last-day criminal cases, the [Riverside Superior Court's] ability to conduct civil trials had been seriously compromised. At that time only one department continued to regularly hear civil trials, and that was as a result of the district attorney's blanket challenge to a judge." (Riverside Task Force Rep., *supra*, at p. 5.) Thus, as the appellate decisions in *Cole* and *Flores* make clear, the lack of judges and courtrooms available to try all of the criminal cases pending before the Riverside court within the presumptive statutory speedy-trial period was not a consequence of that court's failure to devote a reasonable proportion of its resources to its criminal caseload, but reflected instead the circumstance that the number of criminal cases that were filed and pursued to trial in the Riverside Superior Court overwhelmed the resources provided to the court for the resolution of both criminal and civil cases. Under these circumstances—in which the superior court already was granting considerable precedence to the processing of criminal cases over civil cases, and in which it was apparent that the present case was not an isolated last-day criminal matter that reasonably could be accommodated without establishing a precedent that would create an appreciable adverse effect upon the specialized civil departments in question—we agree with the appellate courts in *Cole* and *Flores* and with the Court of Appeal in the present case that the Riverside Superior Court did not violate section 1050 by declining to assign a last-day criminal case for trial in one of the specialized departments handling family law, probate, and juvenile cases.

Although the district attorney acknowledges in his briefing that section 1050's directive that criminal cases be granted precedence over civil cases is not absolute and does not preclude a court from exercising discretion in appropriate circumstances to decline to preempt all civil cases, he nonetheless relies heavily upon two Court of Appeal decisions—*Tudman v. Superior Court* (1972) 29 Cal.App.3d 129 [105 Cal.Rptr. 391] (*Tudman*) and *Perez v. Superior Court* (1980) 111 Cal.App.3d 994 [169 Cal.Rptr. 45] (*Perez*)—that contain language indicating the provision of section 1050 granting precedence to criminal cases over civil cases does indeed impose an absolute and inflexible rule requiring a trial court in all circumstances to grant trial preference to a criminal proceeding over a civil proceeding.

In *Tudman, supra,* 29 Cal.App.3d 129, the parties consented to continue trial to a date beyond the presumptive statutory deadline and on that date all parties announced they were ready for trial. At that point, however, the trial court noted there were no courtrooms available to try the case and found good cause existed under section 1382 to trail the case to await the availability of a trial department. After the case had trailed for a number of days, the defendants sought a writ in the Court of Appeal, contending the trailing order was improper and relying upon the circumstance that while their criminal case was trailing, several civil cases had been sent out for trial. In expressing its agreement with the defendants' contention, the appellate court in *Tudman,* after quoting the portion of section 1050 granting precedence to criminal cases, stated in unequivocal terms: "In view of this firm legislative policy, *the fact that civil cases were sent out for trial* on July 7 [(the day the trial court observed no courtrooms were available to try defendants' criminal case)] *eliminates any legal ground for refusing to send out defendants' case for trial in one of the departments in the civil pool.*" (*Tudman, supra,* 29 Cal.App.3d at p. 132, italics added.) In so stating, however, the court in *Tudman* did not consider what proportion of the court's departments was devoted to the trial of criminal cases and what proportion to civil cases, or what steps the court had taken to facilitate the timely trial of criminal matters. *Tudman* also failed to discuss (or, indeed, to take any note of) this court's prior decision in *Osslo, supra,* 50 Cal.2d 75, which, as we have seen, explicitly held that section 1050's directive that criminal cases be given precedence over civil cases "is not of such an absolute and overriding character *that the system of having separate departments for civil and criminal matters must be abandoned.*" (*Osslo, supra,* 50 Cal.2d at p. 106, italics added.)

The Court of Appeal's decision in *Perez, supra,* 111 Cal.App.3d 994, exhibits a similar flaw. In *Perez,* the record disclosed that *all* the departments of the Superior Court of Ventura County—except the law and motion and master calendar departments—were then engaged in ongoing criminal trials and that, as a consequence, the Ventura court had adopted a general policy permitting ongoing criminal trials to be interrupted one day a week (on the first workday of the week) to enable at least some civil matters—those that could be disposed of in less than one day—to be heard. (*Perez, supra,* 111 Cal.App.3d at p. 997.) In *Perez,* the last day for bringing the defendant's criminal proceeding to trial (within the presumptive statutory period) fell on the first day of the workweek, the day set aside for the trial of short civil matters. In apparent reliance upon the court's general policy, the trial court found good cause to continue the defendant's trial. The defendant sought a writ in the Court of Appeal. In *Perez,* unlike the situation in *Echols, supra,* 125 Cal.App.2d 810, and the other analogous cases discussed above (pp. 1156–1157, *ante*), the record made clear that the Ventura court had granted

considerable precedence to criminal cases over civil cases and thus that this was not a situation in which the court had failed to devote a reasonable proportion of its judges or courtrooms to the trial of criminal matters. Nonetheless, the Court of Appeal in *Perez,* embracing the language from *Tudman, supra,* 29 Cal.App.3d 129, 132, quoted above, held that "[u]nder the firm legislative policy enunciated in section 1050, 'the fact that civil cases were sent out for trial on' " the last day for bringing Perez's case to trial within the statutory period " 'eliminates any legal ground for refusing to send out [Perez's] case for trial in one of the departments in the civil pool. [Citations.]' " (*Perez, supra,* 111 Cal.App.3d at p. 1000, fn. omitted.) As in *Tudman,* however, the court in *Perez* totally overlooked this court's explicit holding in *Osslo, supra,* 50 Cal.2d at page 106, that the provisions of section 1050 granting criminal cases precedence over civil cases is not of such an absolute nature that the system of separate departments for civil and criminal matters must be abandoned.

In addition to ignoring this court's controlling decision in *Osslo, supra,* 50 Cal.2d 75, the decisions in both *Tudman, supra,* 29 Cal.App.3d 129, and *Perez, supra,* 111 Cal.App.3d 994, failed to recognize that the question whether a trial court's policies and practices with regard to the processing of criminal and civil matters violate the provisions of section 1050 is separate and distinct from the question whether good cause exists to delay a criminal defendant's trial for purposes of the statutory speedy-trial provisions of section 1382. In both *Tudman* and *Perez,* the appellate courts' legal analysis proceeds from the assumption that, in each case, the trial court's determination that good cause existed under section 1382 to delay the defendants' trial was erroneous *solely because,* in the appellate court's view, *the trial court violated the provisions of section 1050 in failing to assign the case for trial in a civil department.* As discussed below (pp. 1162–1165, *post*), however, even when a trial court's failure to assign a last-day criminal case for trial in a civil department in preference to a pending civil case does *not* violate section 1050—that is, when there is adequate justification for the trial court's decision not to preempt the trial of a civil matter in favor of a last-day criminal proceeding—it still may be the case that the lack of a number of judges or courtrooms sufficient to try the criminal case within the presumptive statutory period will not constitute good cause for purposes of section 1382 and thus will not be an appropriate basis for refusing to dismiss the criminal proceeding under section 1382. The courts in *Tudman* and *Perez* erred in conflating the distinct issues of the propriety of a trial court's action under section 1050 and the existence of good cause to delay a trial under section 1382.

As demonstrated by the circumstances of this case and of the *Cole* and *Flores* cases, an interpretation of section 1050's provision granting precedence to criminal cases over civil cases that would establish an absolute and

inflexible rule requiring a trial court to grant preference to the trial of every criminal matter over every civil matter in all circumstances—as suggested by the broad language in *Tudman, supra*, 29 Cal.App.2d at page 132, and *Perez, supra*, 111 Cal.App.3d at page 1000—could have the effect of compelling a trial court to devote all of its resources exclusively to the resolution of criminal cases and to abandon entirely its responsibility to provide for the fair administration of civil as well as criminal matters. As the decisions in *Lorraine, supra*, 220 Cal. at page 756, and *Thurmond, supra*, 66 Cal.2d at page 839, teach, such an interpretation of section 1050 would render the statute unconstitutional under the separation-of-powers doctrine.

In *Superior Court v. County of Mendocino, supra*, 13 Cal.4th 45, we explained that although it generally is constitutionally permissible for the Legislature to prescribe a number of furlough days on which the courts of a county would be closed, such a legislative measure would violate the separation-of-powers doctrine and be constitutionally invalid if the legislation went so far as to "defeat" or "materially impair" a court's ability to fulfill its constitutional function. (*Id.* at pp. 52–66; see also *Millholen v. Riley* (1930) 211 Cal. 29, 33–34 [293 P. 69]; *Brydonjack, supra*, 208 Cal. 439, 444.) By the same token, section 1050 poses no separation-of-powers problem if it is understood simply (1) to preclude courts from shortchanging criminal matters by reserving a disproportionate number of judges or courtrooms exclusively for the trial of civil matters, and (2) to direct courts to grant precedence to the trial of criminal cases over civil cases so long as such precedence is consistent with the ends of justice. On the other hand, were section 1050 to be interpreted as establishing the type of rigid and absolute rule suggested by the language in *Tudman, supra*, 29 Cal.App.3d 129, 132, and *Perez, supra*, 111 Cal.App.3d 994, 1000, so that a court would lack discretion to hear *any* civil matter whenever the number of criminal actions filed and pursued to trial was so great as to completely overwhelm the resources provided to the court for the resolution of criminal and civil cases, the statute clearly would defeat or at the very least materially impair the court's fulfillment of its constitutional obligation to provide for fair administration of justice for *all* cases pending in the court, civil as well as criminal, and thus would be unconstitutional.

Under well-established precedent, of course, a statute must be construed, if reasonably possible, in a manner that avoids a serious constitutional question. (See, e.g., *Miller v. Municipal Court* (1943) 22 Cal.2d 818, 828 [142 P.2d 297]; *In re Kay* (1970) 1 Cal.3d 930, 942 [83 Cal.Rptr. 686, 464 P.2d 142]; *People v. Amor* (1974) 12 Cal.3d 20, 30 [114 Cal.Rptr. 765, 523 P.2d 1173].) Accordingly, we conclude that the decisions in *Tudman v. Superior Court, supra*, 29 Cal.App.3d 129, and *Perez v. Superior Court, supra*, 111 Cal.App.3d 994, should be disapproved to the extent those decisions hold that under section 1050 "the fact that civil cases were sent out for trial . . .

eliminates any legal ground for refusing to send out [a criminal] case for trial in one of the departments in the civil pool." (*Tudman*, at p. 132; see *Perez*, at p. 1000.)

For the reasons discussed above, we conclude that the trial court did not err in rejecting the district attorney's contention that, notwithstanding the priority that the Riverside Superior Court was giving to criminal cases by devoting virtually all of its civil departments to the trial of criminal cases, section 1050 obligated the court to go further and assign this case (as well as the numerous other last-day criminal cases then before it) for trial in the specialized family law, probate, or juvenile department. The Court of Appeal properly concluded that the trial court's determination and action did not violate the provisions of section 1050.[11]

## III

As noted above, the district attorney further contends that even if (as we have concluded) the trial court did not violate the provisions of section 1050 in declining to assign defendant's case for trial in one of the specialized civil departments and correctly determined that no judges or courtrooms were available to try defendant's case within the presumptive statutory period for bringing his case to trial, the court nonetheless erred in dismissing the charges against defendant under section 1382, because the court should have found that the lack of a judge or courtroom available to try defendant's case constituted good cause to delay his trial. The district attorney maintains that in the event the trial court properly considered all reasonable alternatives and nonetheless determined that no judge or courtroom was available, the court should have found that good cause existed under section 1382 to delay defendant's trial until a courtroom became available.

 Under section 1382, when a criminal case has not been brought to trial within the time specified in the statute and the defendant has not consented to a postponement of his or her trial, the trial court must dismiss the action unless there is "good cause" for the delay. In *People v. Sutton* (2010) 48 Cal.4th 533 [106 Cal.Rptr.3d 883, 227 P.3d 437] (*Sutton*), we recently examined the concept of good cause embodied in section 1382. *Sutton* explained that "[s]ection 1382 does not define 'good cause' as that term is

---

[11] Although in this case the district attorney did not specifically request the trial court to assign the matter for trial to one of the assigned judges presiding over civil trials at the Hawthorne school site, the legal analysis set forth above demonstrates that the appellate division in *Flores, supra*, 173 Cal.App.4th Supp. 9, 25, correctly concluded that the trial court in that case did not violate section 1050 in declining to assign last-day criminal cases for trial by those judges presiding at that site who had been specifically assigned to the Riverside Superior Court to help alleviate the court's very substantial civil case backlog.

used in the provision, but numerous California appellate decisions that have reviewed good-cause determinations under this statute demonstrate that, in general, a number of factors are relevant to a determination of good cause: (1) the nature and strength of the justification for the delay, (2) the duration of the delay, and (3) the prejudice to either the defendant or the prosecution that is likely to result from the delay. [Citations.] Past decisions further establish that in making its good-cause determination, a trial court must consider all of the relevant circumstances of the particular case, 'applying principles of common sense to the totality of the circumstances . . . .' [Citations.] The cases recognize that, as a general matter, a trial court 'has broad discretion to determine whether good cause exists to grant a continuance of the trial' [citation], and that, in reviewing a trial court's good-cause determination, an appellate court applies an 'abuse of discretion' standard. [Citations.]" (*Sutton, supra,* 48 Cal.4th at p. 546, fn. omitted.)

In *Sutton, supra,* 48 Cal.4th 533, the delay in bringing the defendants' case to trial was attributable to the unavailability of counsel for one of the defendants, resulting from that counsel's ongoing engagement in another client's trial that had taken longer than expected. In the present case, the basis for the delay was not the unavailability of counsel but rather the unavailability of a judge or courtroom to try defendant's case within the presumptive statutory period. Past California decisions establish that when the unavailability of a judge or courtroom is fairly attributable to the fault or neglect of the state, such unavailability does not constitute good cause within the meaning of section 1382.

As this court explained in *Johnson, supra,* 26 Cal.3d 557, 571, in discussing the good-cause provision of section 1382: "A defendant's right to a speedy trial may be denied simply by the failure of the state to provide enough courtrooms or judges to enable defendant to come to trial within the statutory period. . . . '[U]nreasonable delay in run-of-the-mill criminal cases cannot be justified by simply asserting that the public resources provided by the State's criminal-justice system are limited and that each case must await its turn.' [Citation.]" Although the court in *Johnson* recognized that the lack of a sufficient number of judges or courtrooms might constitute good cause to justify the delay of trial under section 1382 in "exceptional circumstances," the decision made clear that delay arising out of chronic congestion of a court's trial docket cannot be excused. (*People v. Johnson, supra,* 26 Cal.3d at pp. 571–572.)[12]

---

[12] In *Johnson, supra,* 26 Cal.3d 557, 571, the court quoted with approval the following passage, relating to the problem of delay caused by court congestion, set forth in the American Bar Association's Standards for Speedy Trial: "[D]elay arising out of the chronic congestion of the trial docket should not be excused . . . . [¶] . . . But, while delay because of a failure to provide sufficient resources to dispose of the usual number of cases within the speedy trial

In the present case, as in the prior cases of *Cole, supra*, 165 Cal.App.4th Supp. 1, and *Flores, supra*, 173 Cal.App.4th Supp. 9, arising out of the same general circumstances prevailing in the Riverside Superior Court during the relevant period, the trial court properly could find that the congested criminal caseload represented a chronic condition rather than an exceptional circumstance, and further that the lack of available courtrooms and judges was attributable to the Legislature's failure to provide a number of judges and courtrooms sufficient to meet the rapidly growing population in Riverside County.[13] Under these circumstances, we conclude the trial court in this matter did not abuse its discretion in determining that the unavailability of a judge or courtroom to bring defendant's case to trial within the statutory

---

limits is not excused, the standard does recognize congestion as justifying added delay when 'attributable to exceptional circumstances.' Although it is fair to expect the state to provide the machinery needed to dispose of the usual business of the courts promptly, it does not appear feasible to impose the same requirements when certain unique, nonrecurring events have produced an inordinate number of cases for court disposition." (ABA Project on Standards for Crim. Justice, Stds. Relating to Speedy Trial (Approved Draft 1968) pp. 27–28.) In elaborating upon the type of "unique, nonrecurring events" that would constitute "exceptional circumstances," this document states: "Thus, when a large-scale riot or other mass public disorder has occurred, some leeway for additional time is required to ensure that the many resulting cases may receive adequate attention from the prosecutor's office, defense counsel (possibly a single public defender office), and the judiciary." (*Id.* at p. 28.)

[13] The lack of a number of judges sufficient to handle the matters pending in the Riverside Superior Court is a long-known and well-documented problem. A 2004 study by the Judicial Council found that approximately 350 additional new judgeships were needed statewide and that the Riverside Superior Court was one of the trial courts most in need of new judgeships. (AOC Off. of Ct. Research, Rep. to Jud. Council, Update of Judicial Needs Study (Aug. 9, 2004) pp. 1, 7 <http://www.courtinfo.ca.gov/reference/resandstats.htm> [as of Oct. 25, 2010].) Cognizant of the state's difficult financial situation, the Judicial Council requested only that the Legislature create the 150 most urgently needed new judgeships over a three-year period. In 2006, the Legislature authorized the creation of the first 50 new judgeships to be allocated to the various superior courts according to the council's uniform-need criteria (Gov. Code, § 69614; Stats. 2006, ch. 390, § 3), and in 2007 the Legislature authorized the creation of 50 additional new judgeships to be similarly allocated pursuant to the council's criteria (Gov. Code, § 69614.2; Stats. 2007, ch. 722, § 2). Although a total of 14 of the 100 new judicial positions authorized under the 2006 and 2007 legislation have been allocated to the Riverside Superior Court, only seven of those positions have been funded to date due to state budget constraints (Riverside Task Force Rep., *supra*, at p. 6), and the growth in workload in the Riverside Superior Court between 2004 and 2008 "largely overwhelmed" even the significant allocation of new judgeships to that court. (AOC Off. of Ct. Research, Rep. to Jud. Council, Update of Judicial Needs Study (Oct. 8, 2008) p. 4 <http://www.courtinfo.ca.gov/reference/resandstats.htm> [as of Oct. 25, 2010].) In the Judicial Council's 2008 report to the Legislature regarding the need for new superior court judgeships, the Riverside Superior Court was ranked first in unmet judicial needs. (See Jud. Council, Rep. on Need for New Judgeships in the Superior Courts (Oct. 2008), submitted to the Legislature pursuant to the requirements of Gov. Code, § 69614, subd. (c) <http://www.courtinfo.ca.gov/reference/resandstats.htm> [as of Oct. 25, 2010].)

period was fairly and reasonably attributable to the fault or neglect of the state and accordingly did not constitute good cause to delay the trial under section 1382.

As he did in the Court of Appeal, the district attorney—in challenging the trial court's determination that good cause to delay defendant's trial did not exist—relies on the appellate department's decision in *Yniquez, supra*, 42 Cal.App.3d Supp. 13. We agree with the Court of Appeal that such reliance is misplaced. As pointed out by that court, our subsequent decision in *Johnson, supra*, 26 Cal.3d 557, took note of the *Yniquez* opinion and expressly questioned the validity of that decision insofar as it held that chronic court congestion properly could be found to constitute good cause to delay a trial and to deny a defendant's motion to dismiss under section 1382. (*Johnson, supra*, 26 Cal.3d at pp. 570–571.) In light of *Johnson*, the Court of Appeal properly found that *People v. Yniquez, supra*, 42 Cal.App.3d Supp. 13 should not be followed, and we disapprove the appellate division's decision in that case.

■ Finally, the district attorney argues that in light of the very substantial number of criminal cases pending in the Riverside Superior Court, that court's policy of declining to assign last-day criminal cases to the specialized family law, probate, and juvenile departments should be considered an "exceptional circumstance," justifying a delay of trial beyond the presumptive statutory period. We disagree. Although a prosecutor is free, within legal and ethical requirements, to pursue whatever charging and plea-negotiation policies he or she deems appropriate, the applicable California statutes do not require a chronically underfunded and understaffed court such as the Riverside Superior Court either (1) to accommodate last-day criminal proceedings by devoting an unreasonable or disproportionate share of its resources to ensure that all last-day matters will be tried within the presumptive statutory period, or (2) to continue such trials beyond the presumptive statutory period (rather than dismiss the criminal proceedings) on the premise that the persistent backlog constitutes "good cause" under section 1382 to justify a delay. The calendar congestion that produced the circumstance in which the numerous last-day criminal cases pending in the superior court exceeded the resources available to the court unquestionably constituted a chronic condition. It cannot properly be characterized as an "exceptional circumstance" as that term was used in our decision in *Johnson, supra*, 26 Cal.3d 557, 571–572.

Accordingly, we reject the district attorney's contention that the trial court erred in concluding the prosecution failed to demonstrate good cause to avoid dismissal under section 1382.

## IV

For the reasons discussed above, the judgment rendered by the Court of Appeal, upholding the judgment of the trial court, is affirmed.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.