Filed 8/2/23 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF<br>RIVERSIDE COUNTY,<br><br>        Respondent;<br><br>JOSE LUIS TAPIA,<br><br>        Real Party in Interest. | E080076<br><br>(Super. Ct. No. BLF2100023)<br><br>**ORDER MODIFYING OPINION<br>AND DENYING PETITION<br>FOR REHEARING**<br>[NO CHANGE IN JUDGMENT] |

The petition for rehearing is denied. The majority opinion filed in this matter on July 11, 2023, is modified as follows:

The second paragraph, last sentence on page 16, should be modified to read "… and there is no complete date from 2022 yet. (See 2023 Court Statistics Report (available at http://courts.ca.gov/13421.htm as of July 12, 2023) [collecting statistics through fiscal year 2022, which ended on June 30, 2022] and the Trial Court Operational Metrics: Year One Report (available at http://courts.ca.gov/documents/lr-2023-tc-operational-metrics-BA2022-ch43.pdf as of July 12, 2023) [same].)"

1

After the second paragraph, last sentence on page 16, as modified, add the following footnote, which will require renumbering all subsequent footnotes: "The District Attorney argued for the first time in his traverse that the Superior Court should have produced case disposition statistics not publicly available under *Chevron Stations, Inc. v. Alcoholic Beverage Control Appeals Bd.* (2007) 149 Cal.App.4th 116, 131. The District Attorney waived the argument by failing to make it in his petition without good cause. (*Committee to Relocate Marilyn v. City of Palm Springs* (2023) 88 Cal.App.5th 607, 637, fn. 8.). The District Attorney also forfeited the argument by failing to make it below. (*People v. Suarez* (2020) 10 Cal.5th 116, 149.)"

The third paragraph, last sentence on page 16 should be modified to read "But, again, the data from 2021 and 2022 is incomplete."

Except for these modifications, the majority opinion remains unchanged. These modifications do not effect a change in the judgment.

CERTIFIED FOR PUBLICATION


CODRINGTON
J.


We concur:

RAMIREZ
P. J.


RAPHAEL
J.


2

Filed 7/11/23 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**


# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO


| | |
|---|---|
| THE PEOPLE, | |
| Petitioner, | E080076 |
| v. | (Super. Ct. No. BLF2100023) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Respondent; | |
| JOSE LUIS TAPIA, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for writ of mandate. John M. Monterosso, Judge. Petition Denied.

Michael A. Hestrin, District Attorney, Emily Hanks and Jesse Male, Deputy District Attorneys, for Petitioner

Lozano Smith Attorneys at Law and Sloan R. Simmons, for Respondent.

Laura Arnold, under appointment by the Court of Appeal, for Real Party in Interest.

1

## I.

## INTRODUCTION

For almost two decades, the Superior Court for the County of Riverside has not had enough judges to adequately serve the county's ever-increasing population. Like every court throughout the country, the Superior Court's operations were severely affected by the COVID-19 pandemic. The pandemic forced the Superior Court to take unprecedented measures, including periodically suspending all jury trials and various deadlines, closing courtrooms, and continuing countless matters for extensive periods of time, through no fault of its own.

Penal Code section[1] 1382 imposes a presumptive 60-day deadline to bring a felony case to trial after a defendant is arraigned. In 2010, our Supreme Court upheld the Superior Court's dismissal of a felony case under section 1382 because there was no available judge or courtroom. (*People v. Engram* (2010) 50 Cal.4th 1131 (*Engram*).) The Court held, without qualification, that "the state's failure, over a considerable period of time, to provide a number of judges sufficient to meet the needs of Riverside County's rapidly growing population and caseload" did not provide good cause to extend section 1382's deadline. (*Engram*, *supra*, at p. 1138.) More recently, Courts of Appeal in other parts of California have held that delay and docket congestion caused by the COVID-19 pandemic constitutes good cause to extend section 1382's deadline. (See e.g., *Stanley v. Superior Court of Contra Costa County* (2020) 50 Cal.App.5th 164, 167-168 (*Stanley*);

_____

[1] All further statutory references are to the Penal Code.

*Hernandez-Valenzuela v. Superior Court* (2022) 75 Cal.App.5th 1108 (*Hernandez-Valenzuela*); *Elias v. Superior Court* (2022) 78 Cal.App.5th 926 (*Elias*).)

In October 2022, about two years and seven months after the pandemic began, the Superior Court granted Jose Tapia's motion to dismiss his felony case because there was no available judge or courtroom to try the case by the time the section 1382 deadline expired. In doing so, the Superior Court found that there was no good cause to extend section 1382's deadline. The Riverside District Attorney seeks writ review of that decision.

This case requires us to decide whether the Superior Court properly found that there was no good cause to extend section 1382's deadline because the unavailability of a judge and courtroom to try Tapia's case, although "related to COVID," was caused mainly by the court's chronic backlog predating the pandemic. We conclude the Superior Court did not abuse its broad discretion under section 1382 in finding that good cause did not exist to grant a continuance. Based on the foregoing, we deny the District Attorney's writ petition.

II.

FACTUAL AND PROCEDURAL BACKGROUND

In March 2020, Governor Gavin Newsom declared a state of emergency in California in response to the COVID-19 pandemic.[2] A few weeks later, now-retired Chief Justice Cantil-Sakauye issued a statewide emergency order that suspended all jury trials and continued them for 60 days and extended section 1382's deadline by 60 days.[3] Shortly afterward, the Chief Justice issued another statewide emergency order that authorized trial courts to issue orders extending section 1382's deadline.[4] The Chief Justice issued another statewide emergency order in April 2020, which again extended section 1382's deadline.[5]

Between March 2020 and August 2022, the Presiding Judge of the Superior Court

---

[2] See Executive Department State of California, Proclamation of a State of Emergency (Mar. 4, 2020), <https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf> [as of July 10, 2023]

[3] See Statewide Order by Hon. Tani G. Cantil-Sakauye, Chief Justice of California and Chair of the Judicial Council (Mar. 23, 2020), <https://newsroom.courts.ca.gov/sites/default/files/newsroom/2020-09/Statewide% 20Order% 20by% 20the% 20Chief% 20Justice-Chair% 20of% 20the% 20Judicial% 20Council% 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.pdf> [as of July 10, 2023]

[4] See Statewide Order by Hon. Tani G. Cantil-Sakauye, Chief Justice of California and Chair of the Judicial Council (Mar. 30, 2020), <https://newsroom.courts.ca.gov/sites/default/files/newsroom/document/Statewide% 2520Order% 2520by% 2520the% 2520Chief% 2520Justice-hair% 2520of% 2520the% 2520Judicial% 2520Council% 25203-30-2020.pdf> [as of July 10, 2023]

*[footnote continued on next page]*

4

received authorization from the Chief Justice to issue 42 orders extending various statutory deadlines, including section 1382's 60-day deadline to bring criminal cases to trial.[6] The last order extending that deadline issued on September 6, 2022, and expired on October 7, 2022.

The Superior Court periodically suspended all jury trials during this time. From March until June 18, 2020, during the beginning of the COVID-19 pandemic, the Superior Court did not hold criminal trials.[7] After resuming trials and other criminal proceedings for about six months, the court suspended jury trials for about seven or eight

---

[5] See Statewide Order by Hon. Tani G. Cantil-Sakauye, Chief Justice of California and Chair of the Judicial Council (Apr. 29, 2020), <https://newsroom.courts.ca.gov/sites/default/files/newsroom/document/Chief_Justice_Statewide_Emergency-Order_04292020S.pdf> [as of July 10, 2023]

[6] See GENERAL ORDER NO.: 2022-30 FORTY-SECOND IMPLEMENTATION OF EMERGENCY RELIEF AUTHORIZED PURSUANT TO GOVERNMENT CODE SECTION 68115, https://www.riverside.courts.ca.gov/PublicNotices/CourtOrders/2022-30%2042nd%20Implementation%20Order%2009.06.2022.pdf

[7] https://www.riverside.courts.ca.gov/GeneralInfo/MediaInfo/Notices/Master-Plan-Restoring-Court-Services.pdf?rev=6-8-20 at p. 8; https://www.riverside.courts.ca.gov/GeneralInfo/MediaInfo/NewsReleases/Benchmark-Criminal-Jury-Trials.pdf at p. 1

weeks in the winters of 2020-2021 and 2021-2022 during spikes in COVID-19 infections.[8] The last suspension of jury trials ended on February 25, 2022.[9]

In September 2020, the District Attorney filed charges against Tapia for felony assault with a deadly weapon. At the District Attorney's request, the charges were dismissed at the preliminary hearing.

In February 2021, the District Attorney refiled a complaint against Tapia charging him with assault with a machete (§ 245, subd. (a)(1)) and alleging that he personally used a deadly and dangerous weapon (§ 12022, subd. (b)(1)) and personally inflicted great bodily injury on the victim (§ 12022.7, subd. (a)). Tapia was arraigned in March 2021.

After four continuances at the parties' request, Tapia's trial was set for January 12, 2022. But because of emergency orders then in place, jury trials had been suspended, so Tapia's trial was continued for 30 days. That order suspending jury trials—the last one the Superior Court issued—expired on February 25, 2022.[10]

---

[8] https://www.riverside.courts.ca.gov/GeneralInfo/MediaInfo/NewsReleases/Resumption-of-Jury-Trials.pdf; https://www.riverside.courts.ca.gov/PublicNotices/CourtOrders/2022-9%20Suspension%20of%20Jury%20Trials%20and%20Access%20to%20Courtrooms.pdf

[9] https://www.riverside.courts.ca.gov/PublicNotices/CourtOrders/2022-16%20General%20Order%20re%20Suspension%20of%20Jury%20Trials%20thru%202.25.2022.pdf

[10] https://www.riverside.courts.ca.gov/PublicNotices/CourtOrders/2022-16%20General%20Order%20re%20Suspension%20of%20Jury%20Trials%20thru%202.25.2022.pdf

After jury trials resumed, Tapia's case was trailed multiple times in 30-day increments under the emergency order then in effect. On February 23, 2022, and again in March, April, and June 2022, Tapia's trial was continued "due to courtroom unavailability." The trial court granted the District Attorney's continuance request in June 2022 and granted Tapia's request for a continuance in July 2022. The parties stipulated to another continuance in September 2022. In total, there were 12 continuances.

October 26, 2022, was the last day for Tapia's trial under section 1382, but there were no available courtrooms. The trial court therefore set a hearing on Tapia's opposed motion to dismiss under section 1382 for the next day.

At the hearing, the Hon. John M. Monterosso, the Presiding Judge of the Superior Court, explained in extensive detail why he was granting Tapia's motion to dismiss. Judge Monterosso prefaced his ruling by noting that there is "no doubt that there is a backlog" of criminal cases in the Superior Court, "but the question is whether or not we have a chronic backlog or whether this is the backlog that is more acute based on exceptional circumstances" created by the COVID-19 pandemic.

Judge Monterosso noted that the Superior Court "slowed down considerably" but did not "shut down" between mid-March 2020, and mid-June 2020, when "criminal departments opened up in full." He explained that the criminal departments had been "running full speed" since then, except for the two winter closures during COVID-19

7

spikes. The criminal departments continued "doing jury trials non-stop" and "full-time" after the second and last winter shutdown ended on February 25, 2022.

In Judge Monterosso's view, the Superior Court's resources and caseload are "not much different today" than when our Supreme Court decided *Engram* in 2010. He noted that the court's "workload has increased, maybe not based on pure filings," but because "there are so many other things that aren't counted as filings that are being dropped into our lap."

Judge Monterosso then found that the three cases the District Attorney relied on, *Hernandez-Valenzuela*, *Stanley*, and *Elias*, are distinguishable. As for *Hernandez-Valenzuela*, the superior court in San Francisco shut down its criminal departments from mid-March 2020 until June 28, 2021—one year and three months—because it operated under "different local orders" than the Superior Court. Judge Monterosso found *Stanley* "completely off base" because it concerned jury trials during the beginning of the COVID-19 pandemic when a statewide emergency order "basically shut everybody down." Finally, Judge Monterosso found that *Elias* was not applicable because the San Diego Superior Court continued the defendant's trial based on that court's "general orders" to allow continuances because of the COVID-19 pandemic, but the Superior Court's similar orders had expired.

Judge Monterosso then explained why there was no good cause to continue Tapia's trial. He found that although there were exceptional circumstances justifying a continuance in "acute" phases "early on in the pandemic," the Superior Court had

8

"moved into a period" where Tapia's case (and the dozens dismissed after his) could not be timely tried because of the court's "chronic" backlog that has existed since long before the pandemic. Judge Monterosso acknowledged that "[e]veryone had a backlog from COVID" and that the Superior Court's "chronic backlog . . . is related to COVID," but found that the backlog was "not caused by COVID to the extent that this becomes an exceptional set of circumstances" justifying a continuance under section 1382.

Judge Monterosso then granted Tapia's motion to dismiss his case under section 1382. On the same day, Judge Monterosso called and dismissed 44 cases for the same reasons that he dismissed Tapia's case.

The District Attorney timely petitioned for a writ of mandate, prohibition, or other appropriate relief. At our request, Tapia and the Superior Court submitted an informal response to the petition. We then issued an order to show cause why the petition should not be granted. The Superior Court elected to stand on its informal response while Tapia filed a return, followed by a traverse from the District Attorney.

III.

DISCUSSION

The District Attorney's petition requires us to decide whether the Superior Court erroneously dismissed Tapia's case because there was no good cause to extend section 1382's deadline. We conclude the Superior Court did not err.

A. *Writ Review*

We first address and reject the Superior Court and Tapia's argument that the writ should be summarily denied because writ review is inappropriate. The Superior Court and Tapia argue the District Attorney has an adequate remedy at law because the dismissal order is appealable (§ 1238, subd. (a)(8)) and the District Attorney has appealed the order.

"Generally, a judgment that is immediately appealable is not subject to review by mandate or other extraordinary writ. [Citations.] Mandate is available to review an appealable judgment only when the remedy by appeal would be inadequate or the issues presented are of great public importance and must be resolved promptly." (*Powers v. City of Richmond* (1995) 10 Cal.4th 85, 112-113.) This case is about the Superior Court's decision to dismiss dozens of criminal cases because they could not be timely tried due to courtroom unavailability. In declining to continue Tapia's case, Judge Monterosso noted that he anticipated "probably another 50" cases would be ready for trial the next day, and "another 50" the day after, which suggests the Superior Court may keep dismissing criminal cases because there is no courtroom available. The writ petition therefore presents an issue of great public importance that must be resolved promptly. (*Ibid.*)

B. *Applicable Law and Standard of Review*

Under section 1382, subdivision (a)(2), "[t]he presumptive time period established by state law for bringing a felony case to trial is 60 days from the date a defendant is

arraigned on an information or indictment." (*Engram*, *supra*, 50 Cal.4th at p. 1136.) If a felony case is not brought to trial within that deadline, the trial court "shall order the action to be dismissed" unless there is good cause for the delay. (§ 1382, subd. (a)(2).)

Good cause does not exist "when the lack of a judge or courtroom available to timely bring a criminal defendant to trial is fairly and reasonably attributable to the fault or neglect of the state." (*Engram*, *supra*, 50 Cal.4th at p. 1138.) Court congestion therefore does not constitute good cause unless it is caused by "'exceptional circumstances.'" (*Id*. at p. 1145.)

The trial court has "broad discretion to determine whether good cause exists to grant a continuance of the trial." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037.) We therefore review a trial court's good-cause determination for an abuse of discretion. (*Engram*, *supra*, 50 Cal.4th at p. 1163.) The trial court abuses its discretion only when its decision "'exceeds the bounds of reason.'" (*Elias*, *supra*, 78 Cal.App.5th at p. 938.)

C. *Analysis*

We first note some undisputed facts. First, no one disputes that the COVID-19 pandemic severely disrupted the Superior Court's operations to a varying degree between the onset of the pandemic in March 2020 until Tapia's case was dismissed in October 2022. Second, it is undisputed that the pandemic qualifies as an "exceptional circumstance" under section 1382 that could justify a continuance in some cases. Third, there is no dispute that the Superior Court has had a chronic backlog because of a lack of sufficient judges which persists to this day. Fourth, the Superior Court's backlog is not

11

attributable to the court's mismanagement.

The question, then, is whether Judge Monterosso reasonably found that the lack of an available judge and courtroom to try Tapia's case (and the other ones dismissed after his) was "fairly attributable" to the Legislature's failure to provide the Superior Court with sufficient judicial resources and its resulting chronic backlog, even though the "exceptional circumstances" of the COVID-19 pandemic had contributed to the backlog.

This is a fact-intensive question that is generally left to the Superior Court's broad discretion. (See *People v. Sutton* (2010) 48 Cal.4th 533, 546, fn. 8.) Judge Monterosso reasonably found that, although the COVID-19 pandemic had contributed to the Superior Court's backlog, the court's chronic backlog predating the pandemic was the main reason why Tapia's case (and dozens of other cases) could not be tried by section 1382's deadline. As a result, Judge Monterosso's decision to dismiss Tapia's case did not "exceed the bounds of reason" and was not an abuse of his broad discretion.

In *Engram*, decided in 2010, our Supreme Court observed that "[t]he lack of a number of judges sufficient to handle the matters pending in the Riverside Superior Court is a long-known and well-documented problem." (*Engram*, *supra*, 50 Cal.4th at p. 1164, fn. 13) The court also outlined the various reports prepared between 2004 and 2008 documenting how the Superior Court was "chronically underfunded and understaffed." (*Id.* at p. 1165; *id.* at pp. 1136-1137, 1164, fn. 13.) Our Supreme Court affirmed the Superior Court's dismissal of 18 criminal cases because there was no available courtroom when the section 1382 deadline expired, even though the Superior Court had "devoted

12

virtually all of its resources" to criminal cases. (*Engram*, *supra*, at p. 1137.) In doing so, *Engram* held that "when the lack of a judge or courtroom available to timely bring a criminal defendant to trial is *fairly and reasonably attributable* to the fault or neglect of the state, that circumstance does not constitute good cause to delay the defendant's trial for purposes of section 1382." (*Id.* at p. 1138, italics added.) Thus, the "critical inquiry is whether the congestion or backlog is attributable to chronic conditions as opposed to exceptional circumstances considering all of the relevant circumstances." (*Hernandez-Valenzuela*, *supra*, 75 Cal.App.5th at p. 1127.)

As Judge Monterosso emphasized, the Superior Court has remained severely underfunded and understaffed since *Engram*. The Superior Court has 3.7 judicial officers per 100,000 residents of Riverside County while the statewide average is 11.4 judicial officers per 100,000 residents.[11] Since at least 2012, the number of criminal filings has *always* outpaced the Superior Court's dispositions despite the court's best efforts. In November 2020, the Judicial Council found that the Superior Court remained seriously understaffed as of September 2019.[12] According to the Judicial Council, the Superior Court had 85 authorized and funded judicial positions as of 2019, but needed 30 (35%)

---

[11]

https://www.riverside.courts.ca.gov/GeneralInfo/MediaInfo/NewsReleases/Press%20Release.10252.pdf

[12]

https://www.courts.ca.gov/documents/2020_Update_of_the_Judicial_Needs_Assessment.pdf

more.[13]  This placed the Superior Court as the trial court with the second-highest need for new judges after San Bernardino Superior Court.[14]

The Judicial Council issued another report about a week after Judge Monterosso dismissed Tapia's case.[15]  This report, issued on October 31, 2022, analyzed the California trial courts' judicial officer needs based on filings from fiscal years[16] 2018-2019 and 2020-2021, with 2019-2020 data omitted because of the pandemic's effects on filings.[17]  The report shows that although the Superior Court's circumstances have improved in recent years, it remains severely understaffed.  Depending on the metric, the Superior Court remains the second or third most-underfunded trial court in California.[18]

---

[13] https://www.courts.ca.gov/documents/2020_Update_of_the_Judicial_Needs_Assessment.pdf at p. 6.

[14] https://www.courts.ca.gov/documents/2020_Update_of_the_Judicial_Needs_Assessment.pdf at p. 8

[15] Although this report was not introduced in the trial court and we rarely consider new evidence on appeal, we may consider the report to affirm the Superior Court.  (See *Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian* (1990) 218 Cal.App.3d 1058, 1090.)

[16] The California courts' fiscal year begins on July 1 and ends on June 30 the following year. https://www.courts.ca.gov/24153.htm

[17] https://www.courts.ca.gov/documents/Report-to-the-Legislature_2022-Update-of-the-Judicial-Needs-Assessment.pdf at p. 4

[18] https://www.courts.ca.gov/documents/Report-to-the-Legislature_2022-Update-of-the-Judicial-Needs-Assessment.pdf at p. 6 Table 2 and at pp. 8-9 Table A1.

When considering the difference between the Superior Court's 89 funded judicial positions and its "judicial need" of 111.7, rounded down to 111, the Superior Court currently needs 22 (25%) more judges, making it the trial court with the second-highest need for new judges.[19] But if the judicial need is not rounded down to the nearest whole number, then the Superior Court has the third-highest need for new judges (26% more), after Tehama County Superior Court, which has four judicial officers but needs 1.2 more judgeships (29%) and San Bernardino County Superior Court, which has 100 judicial officers but needs 30 more judgeships (30%). If rounded down, however, the Superior Court still has the second-highest need for new judges.

This data from the Judicial Council's reports shows that the Superior Court was significantly underfunded and understaffed before the COVID-19 pandemic and remains significantly underfunded and understaffed to this day. Judge Monterosso thus could reasonably find that the unavailability of a courtroom to timely try Tapia's case was fairly attributable to the Superior Court's chronic shortage of judges, even though the COVID-19 pandemic may have exacerbated the shortage.

The District Attorney argues other data from the Judicial Council's Court Statistic Reports[20] supports his position. The District Attorney points to data showing that the

---

[19] https://www.courts.ca.gov/documents/Report-to-the-Legislature_2022-Update-of-the-Judicial-Needs-Assessment.pdf at p. 6 Table 2

[20] The Court Statistic Reports, which are issued on an annual and 10-year basis, "survey the condition and business of the California courts" and compile data on many variables, including criminal filings and dispositions for each superior court.

Superior Court completed 580 criminal trials in 2019, 372 in 2020, and 127 in 2021, with criminal dispositions similarly falling from 251,639 in 2019, to 190,552 in 2020, and then 168,589 in 2021.[21] In the District Attorney's view, this data compels the conclusion the COVID-19 pandemic caused the Superior Court's "productivity to plummet," thereby causing the delay in bringing Tapia's case to trial. We disagree.

First and most importantly, as the District Attorney noted in his opposition below—but not in his petition or traverse—the data on felony dispositions and jury trials from 2021 is incomplete. It therefore does not accurately capture the Superior Court's criminal productivity in 2021,[22] and there is no data from 2022 yet.

Second, the data from 2020 and 2019 does not prove the District Attorney's argument that the COVID-19 pandemic caused a significant drop in the Superior Court's productivity that *persisted through October 2022*, when the Superior Court dismissed Tapia's case. The District Attorney focuses on the raw number of jury trials and dispositions in fiscal years 2019 and 2020, noting that both decreased from fiscal year 2019 to 2020. But, again, the data from 2021 is incomplete and we have no data on 2022.

---

[21] The District Attorney extracted this data from the Court Statistics Report issued in November 2021, which compiled data from 2010 through 2020, and organized it into a concise table. No one has challenged the accuracy of the table's figures. https://www.courts.ca.gov/documents/2021-Court-Statistics-Report.pdf

[22] The data from fiscal year 2021 remains incomplete. See https://www.courts.ca.gov/documents/2022-Court-Statistics-Report.pdf at pp. 138, 140

Criminal filings have outpaced dispositions *every year* between fiscal years 2012 and 2021 despite an overall decrease of 29 percent in filings, and the delta between criminal filings and dispositions fluctuates each year.[23] For instance, in fiscal year 2017, there were 47,519 criminal filings with 44,290 dispositions, a filing-to-disposition ratio of 93.3 percent. But that ratio plummeted the next year. In fiscal year 2018, there were 52,066 criminal filings with 41,329 dispositions, a filing-to-disposition ratio of 79.3 percent. In fiscal 2019, however, there were 44,268 criminal filings with 39,715 dispositions, a filing-to-disposition rate of 88.6 percent—nearly 10 percent higher than fiscal year 2018 but still about 5 percent lower than fiscal year 2017.

What's more, the percentage of criminal cases resolved by jury trial fluctuated during these years. In fiscal year 2017, 441 cases of the 44,290 dispositions (.0099%) were resolved by a jury trial. In fiscal year 2018, 509 cases of the 41,329 dispositions (.012%) were resolved by a jury trial. And in fiscal year 2019, 580 cases of the 39,238 dispositions (.014%) were resolved by a jury trial.

In short, the one-year comparison of filings, dispositions, and jury trials in fiscal years 2019 and 2020, that District Attorney advances cannot and does not show that the pandemic caused the delay in trying Tapia's case, which was filed in February 2021 and dismissed 18 months later. That data, which stops in mid-2020, also does not undermine Judge Monterosso's finding that any COVID-related backlog had been resolved by the

---

[23] https://www.courts.ca.gov/dashboard.htm (Felony, Misdemeanor-NonTraffic, and Misdemeanor-Traffic).

17

time Tapia's case was dismissed such that the Superior Court had "moved into a period" of chronic, pre-COVID congestion and delay caused by only a lack of available judges.

Judge Monterosso also correctly found that *Stanley*, *supra*, 50 Cal.App.5th 164, *Hernandez-Valenzuela*, *supra*, 75 Cal.App.5th 1108, and *Elias*, *supra*, 78 Cal.App.5th 926, are distinguishable. *Stanley* arose from the Contra Costa Superior Court and was decided in June 2020, during the height of the pandemic when state and local emergency orders suspending jury trials and allowing trial courts to extend section 1382's deadline were in place. (*Stanley*, *supra*, 50 Cal.App.5th at p. 166.) Tapia's case, on the other hand, was dismissed in October 2022, more than two years after the Superior Court resumed jury trials and long after the court began running at full capacity in February 2022.

*Hernandez-Valenzuela* arose from the San Francisco Superior Court, which could not "operate at its usual capacity for approximately 15 months" with several periods of not holding any jury trials and sometimes operating with only four out of 10 criminal departments open. (*Hernandez-Valenzuela*, *supra*, 75 Cal.App.5th at p. 1127.) The superior court fully reopened on June 28, 2021, about three months before the defendants moved to dismiss their cases under section 1382. (*Hernandez-Valenzuela*, *supra*, at p. 1123.)

Here, however, the Superior Court had been holding jury trials since June 2020 and its criminal departments had been "running full speed" since then (except for the two winter shutdowns). While the defendants in *Hernandez-Valenzuela* moved to dismiss

18

between seven to 12 weeks after the San Francisco trial court had fully reopened, Tapia moved to dismiss *eight months* after the Superior Court fully reopened.

In *Elias*, the San Diego Superior Court continued the defendant's trial over his objection on July 6, 2021, based on that court's general pandemic-related orders allowing continuances under section 1382. (*Elias*, *supra*, 78 Cal.App.5th at p. 931.) About two weeks after the superior court fully reopened near the end of July 2021, the superior court denied the defendant's request to dismiss the case under section 1382 and continued trial again. (*Elias*, *supra*, at p. 926.) The *Elias* court held that neither continuance was an abuse of discretion because both were indisputably attributable to a backlog caused by the pandemic, which remained when the defendant moved to dismiss weeks after the superior court fully reopened, and both continuances were permissible under the court's general orders still in effect. (*Id.* at pp. 941-942.) Again, Tapia did not move to dismiss within weeks of the Superior Court fully reopening. He did so eight months after the Superior Court fully reopened and after the court's general orders had lapsed.

Not only are *Stanley*, *Hernandez-Valenzuela*, and *Elias* distinguishable due to their procedural postures, they are also distinguishable because they arose from superior courts with no history of chronic backlogs. In fact, the Judicial Council has found that all three

19

superior courts have had *more judges* than they need since at least 2019.[24]  That remains

true today.[25]

        We may grant the District Attorney's petition only if Judge Monterosso's order

dismissing Tapia's case "'exceeds the bounds of reason.'"  (*Elias*, *supra*, 78 Cal.App.5th

at p. 938.)  Given the Superior Court's chronic congestion that has existed for nearly two

decades and remains unresolved to this day, Judge Monterosso reasonably could find that

Tapia's case could not timely be brought to trial because there was no available judge

was "fairly attributable to the state's failure, over a considerable period of time, to

provide a number of judges sufficient to meet the needs of Riverside County's rapidly

growing population and caseload—a circumstance fairly attributable to the fault or

neglect of the state."  (*Engram*, *supra*, 50 Cal.4th at p. 1138.)  We therefore deny the

District Attorney's petition.

        As the District Attorney acknowledges, the Superior Court has done everything

within its means to bring criminal cases to trial within section 1382's deadline.  Despite

its best efforts, the Superior Court simply does not have enough judges to adequately

tackle its chronic congestion, which persists to this day.[26]  This is a problem only the

---

[24] https://www.courts.ca.gov/documents/2019_Update_of_the_Judicial_Needs_Assessment.pdf at pp. 7-8

[25] https://www.courts.ca.gov/documents/Report-to-the-Legislature_2022-Update-of-the-Judicial-Needs-Assessment.pdf at pp. 8-9

[26] See https://www.courts.ca.gov/documents/Report-to-the-Legislature_2022-Update-of-the-Judicial-Needs-Assessment.pdf

20

Legislature can correct. (See Gov. Code § 69592 [providing for 53 judges for Riverside County]; see also Senate Bill No. 75 [proposed legislation to add 26 new superior court judgeships in San Bernardino and Riverside counties to address the region's "explosive growth" since 2000], https://legiscan.com/CA/text/SB75/2023.)

The concurrence fears that our opinion "could be read to suggest that all that is needed to support the trial court's finding here is that the county's courts are severely underfunded" and "could be read to indicate the courts can do nothing but advocate for sufficient funding assistance." (Conc. opn., *post*, at p. 9.) Our opinion should not be construed in either way.

We hold only that, on this record, *this* Superior Court permissibly found that its inability to timely bring the dismissed cases to trial was "fairly attributable to the state's failure, over a considerable period of time, to provide a number of judges sufficient to meet the needs of Riverside County's rapidly growing population and caseload—a circumstance fairly attributable to the fault or neglect of the state." (*Engram*, *supra*, 50 Cal.4th at p. 1138.) Although a severely, chronically underfunded superior court could conceivably meet all of the demands of its criminal docket within section 1382's deadlines, that is not the case here, and has not been for over a decade. (See *id*. at pp. 1136-1337.) We therefore cannot and do not decide whether underfunding alone could justify the dismissals at issue here.

We agree with the concurrence that "[i]f the trial court can do more, it should." (*Id*. at p. 10.) There may be things the Superior Court (and other courts) could do to meet

21

section 1382's requirements beyond advocating for more funding. But this Superior Court has been unable to meet the demands of its criminal docket for years, and nothing in the record suggests it could have done more with the resources the Legislature has provided.

Judge Monterosso, then the Presiding Judge of the Superior Court, reasonably found that Tapia's case (and the other dismissed cases) could not be tried within section 1382's deadlines simply because there are "[n]ot enough judges." For that reason, we hold only that Judge Monterosso did not abuse his discretion in determining that there was no good cause under section 1382 to continue the trial over Tapia's objection. Whether there may be good cause on a different record before a different judge is not before us.

IV.

DISPOSITION

The District Attorney's petition for a writ of mandate is denied.

CERTIFIED FOR PUBLICATION

CODRINGTON
J.

I concur:

RAMIREZ
P. J.

22

[*People v. Tapia*, E080076]

RAPHAEL, J., Concurring.

I join in holding that the Riverside County Superior Court presiding judge did not abuse his discretion in finding no good cause for a continuance under Penal Code section 1382 to bring this criminal case to jury trial, requiring its dismissal. The court found that the inability to hold a trial for this case (and 44 others dismissed on the same day) resulted from the chronic problem that the state had not funded enough judicial officers in the county, rather than from the transitory occurrence of the Covid pandemic. I write to explain that I am deferring to the judgment of a presiding judge who grounded his ruling in knowledge of the court's operations. I respectfully wish to emphasize that our reason for affirming should not be solely that the court is severely underfunded. That alone is not enough to dismiss criminal cases.

I

Thirteen years ago, our Supreme Court held that the "fault or neglect of the state" in failing to provide "a number of judges sufficient to meet the needs of Riverside County's rapidly growing population and caseload" supported the court's finding that there was no good cause for a Penal Code section 1382 continuance of a criminal case. (*People v. Engram* (2010) 50 Cal.4th 1131, 1138 (*Engram*).)

Even then, in 2010, the lack of judges funded for Riverside County was "a long-known and well-documented problem." (*Engram*, *supra*, 50 Cal.4th at p. 1164, fn. 13.) The problem is still well-known and well-documented, and it is not disputed. The state's

1

funding for Riverside County's judicial offices lags below a subsistence level, as our judiciary's most recent assessment determined that the county needs about 25 percent more judges to meet its assessed need.  (See maj. opn., *ante*, at p. 15.)

That statistical showing is *necessary* to establish that the court faces a "chronic condition" that cannot justify a continuance of a case, rather than an "'exceptional circumstance'" that can.  (*Engram*, *supra*, 50 Cal.4th at p. 1165.)  But it is not alone *sufficient* to explain or analyze whether the court is able to try all its felony cases.  The Riverside County courts have been chronically underfunded for a generation, but the court has not needed to constantly dismiss felony cases due to a lack of courtrooms.

The difficult question as to why there are not enough judges to preside over this trial (and others) is this: why *now*?  And why in this precise number of cases?

A

Speaking at some length at the October 27, 2022, hearing, Presiding Judge John M. Monterosso explained his determination that the lack of a judge to try this case was attributed to the court's chronic lack of funding and not to the Covid-19 pandemic.  In doing so, he did not rely on statistics about case dispositions.  Rather, he relied on information that came from his experience presiding over court operations.

First, he explained chronologically the effect of the pandemic.  The court was "slowed down considerably" at the pandemic's outset on March 16, 2020.  The criminal departments then re-opened on June 15, 2020, and began "running full speed."  While for two years the state's Chief Justice issued emergency orders allowing for good cause

2

extensions, "trial courts were shutting down on a regular basis due to acute infections" sustained by court staff, jurors, and lawyers. As well, two waves of Covid shut the court down for seven or eight weeks during each of the two pandemic winters. The criminal courts, though, had been holding jury trials "full-time since the last criminal trial shutdown ended on February 25, 2022."

Judge Monterosso indicated that the court since had reached a point of "chronic backlog" rather than one based on "exceptional circumstances." As to the case before us, "[n]othing is going to open up" to get it tried, and the next day there will be more cases waiting, and more the day after that.

Secondly, Judge Monterosso addressed some details of court operations — distinct from Covid — that explained why the court cannot hold enough felony jury trials to meet the need. Perhaps the largest factor as to how many felony cases can be tried is how the presiding judge allocates judges to meet the many *other* needs of the court: juvenile dependency, juvenile delinquency, misdemeanors, traffic violations, family law, probate, large "unlimited" civil lawsuits, and smaller "limited" civil cases, unlawful detainer, and small claims. *Engram* established that the Riverside superior court's reasonable decisions to designate and maintain different civil and criminal courtrooms does not create good cause for a criminal case continuance where the state has underfunded the county's judiciary. (*Engram*, *supra*, 50 Cal.4th at p. 1156.)

3

In explaining his ruling, Judge Monterosso indicated he was allocating 18 or 19 judges to criminal trial departments, as well as judges to additional departments for settlement conferences to try to resolve cases. This was out of about 71 authorized judges. We are given no reason to question the presiding judge's determination that this was the most that could reasonably be allocated to felony criminal for the court "to fairly and efficiently administer all of the judicial proceedings that are pending before it." (*Engram*, *supra*, 50 Cal.4th at p. 1146.) Nor do we have reason to doubt that the court provides "considerable preference to the trial" of criminal cases, or to conclude that it "shortchanges criminal matters and does not devote a reasonable proportion of its resources to the trial of criminal cases." (*Engram*, at pp. 1137-1138.)

Third, apart from allocating judges, the types of crimes charged and the plea bargains offered can affect the cases left for trial. "[T]he backlog is created . . . when too few cases are resolved prior to trial," the presiding judge stated. "Mostly the District Attorney will, per their prerogative, offer an attractive offer . . . each side is giving a little something up. And when that process stops happening, cases pile up."

Fourth, Judge Monterosso stated that "there are so many other things that aren't counted as filings that are being dropped in our lap." He did not explain more specifically. We have, though, been given no reason to doubt that there are more burdens on the court recently than in the past.

Finally, the presiding judge indicated that Covid-19 was "[n]ot gone wholly" as a factor, but rather was "not any different than a normal cold and flu season as it relates to

4

people being out with illnesses." That effect differed from the pandemic when Covid caused a "direct impact on trial court operations" with courts regularly shutting down. The current absence of courtrooms is "fairly and reasonably attributable to the fault or neglect of the state" if the court lacks the judges to deal with occasional absences caused by endemic illnesses, as those "represent[] a chronic condition rather than an exceptional circumstance" (*Engram*, *supra*, 50 Cal.4th at p. 1164).

## B

In this writ proceeding, we are reviewing the presiding judge's determination that the chronic congestion of an underfunded court, rather than the Covid-19 pandemic, is the cause of the court's inability to try this case. We ordinarily presume a trial court's judgment is correct and do not "set aside on appeal absent an affirmative showing of reversible error." (*Samara v. Matar* (2018) 5 Cal.5th 322, 335.) In cases alleging violations of section 1382, we review a trial court's determination under a deferential abuse of discretion standard. (*Engram*, *supra*, 50 Cal.4th at pp. 1162-1163.) We have no argument advanced, nor reason in the record, to conclude that the presiding judge's reasons for the determination were outside his discretion. I would therefore deny the petition, deferring to the presiding judge's reasoning and determination.

## II

In the trial court and here, the District Attorney's argument did not engage directly with Judge Monterosso's reasoning. The argument relies entirely on statistics showing a reduction in the county's disposition of criminal cases.

The District Attorney's writ petition observes that court statistics reports from our state's judicial council show that before the pandemic the court "was able to achieve many more dispositions in criminal cases." The District Attorney's conclusion is this (italics added): "the pandemic *caused* this productivity to plummet." Thus, the District Attorney argues that the trial court was wrong to conclude that the chronic lack of funding caused there to be no judge to try this case, so it should have found that Covid-19 did instead.

There are two problems with this approach.

The first problem is the period that District Attorney's statistics cover. When the District Attorney filed his petition and traverse, the most recent statistics available were from the 2022 Court Statistics Report, which covered the fiscal year from July 1, 2020, through June 30, 2021. During this period, even Judge Monterosso indicated there was good cause for continuances of felony trials due to the Covid pandemic. As he stated, the county courts were closed for about two months during the winter of that year and individual courts were "shutting down on a regular basis" when persons got sick. Statistics are not even necessary to show that court shutdowns caused the number of jury trials to decrease during the two years beginning in March 2020.

Judge Monterosso's view, in contrast, was that by October 2022, after regular shutdowns stopped, the under-resourced court had been unable keep up with felony jury trials; the cases keep coming and "[n]othing is going to open up." Showing that productivity dropped during the height of the pandemic does not address that. Indeed, the

District Attorney states that case "filings were decreasing" during the pandemic, but the most recent statistics show a sharp increase in felony filings as the pandemic waned. The 2023 court statistics report shows that in the fiscal year ending June 30, 2022, felony filings in the county jumped to 14,178, the highest level since 2016, and notably higher than the most recent years. Indeed, that year's number of felony filings is about 20 percent higher than the number (11,302) in the year that ended in mid-2019, the last full year *before* the pandemic.[27] That statistic lends support to Judge Monterosso's ruling.

The second problem with the District Attorney's argument is that — even if the statistics were current — a decrease in the trial court's capacity to try felony cases does not engage with Judge Monterosso's reasoning as to causation. Case-disposition statistics could show that the trial court is adjudicating fewer cases. But they cannot alone establish the *cause* of the drop.

The District Attorney's statistics show fluctuating numbers of felony jury trials in Riverside County from year to year — even before the pandemic. In the fiscal years that ended in 2016 and 2017, there were 502 jury trials followed by 305. That was about a 40 percent drop in trials in one year, and it was before Covid-19 existed. Factors other than Covid affect that number.

---

[27] https://www.courts.ca.gov/documents/2023-Court-Statistics-Report.pdf [table 7a, page 135]. The annual felony filings, as the District Attorney lists them, were 12,568 (2017), 13,004 (2018), 11,653 (2019), 11,302 (2020), and 11,307 (2021).

Judge Monterosso identified factors other than Covid that were affecting case dispositions in October 2022. For instance, he stated that things "that aren't counted as filings . . . are being dropped in our lap." On the court of appeal, we are aware that the Superior Court has recently been spending much time on postjudgment petitions; in calendar year 2022 about 40 percent of our criminal appeals from Riverside County were taken from such rulings. If the time spent on such petitions constitutes a shift in the Superior Court's caseload from a few years ago, it may mean that a judge or judges who would otherwise have been able to handle felony trials is instead handling petitions. That could cause a dip in the number of jury trials. But the cause would not be Covid.

Likewise, the most recent statistics show the Riverside Superior Court handled about 150 more mental health hearings in the fiscal year that ended June 30, 2022, than in the fiscal year that ended in 2019, before the pandemic.[28] If this represents a burden on the court that takes judicial time that would otherwise be allocated to try felony jury trials, that might lead to a dip in that number, without Covid as a cause.

These are illustrations of why the case disposition statistics that are the sole foundation for the District Attorney's argument do not demonstrate that Covid, rather than something else, caused the inability to try the case before us. There is, in fact, no

_____

[28] The 2022 statistics show Riverside county judges held 766 mental health hearings while adjudicating 1071 mental health filings. (https://www.courts.ca.gov/documents/2023-Court-Statistics-Report.pdf [table 12e, page 183]) The 2019 statistics show 616 hearings while adjudicating 873 mental health filings. (https://www.courts.ca.gov/documents/2020-Court-Statistics-Report.pdf [table 11e, page 160])

single cause of the court's inability to try a case. The question must be what counts as the proximate (or legal) cause, regardless of whether that is defined as a major, predominant, or substantial cause. A statistic that shows that the county is adjudicating fewer felony cases does not reveal the proximate cause of that drop, though the presiding judge's knowledge of court operations might.

To better evaluate Judge Monterosso's reasoning, we would need different information than merely case disposition statistics. For instance, if there are fewer judges now handling felony trials in Riverside County than in the past (and our record does not show that there are) it would be fair to require an explanation as to why that is so. Likewise, if the judges who are handling criminal trials are handling fewer of them (and our record does not show that they are) it would be fair to ask why that is. Simply showing in the aggregate that Riverside County is disposing of fewer cases, or holding fewer jury trials, does not fully address Judge Monterosso's reasoning.

III

The majority opinion cogently refutes the District Attorney's statistics in important ways. Notably, it explains that the District Attorney's numbers are not recent enough to be meaningful. (Maj. opn., *ante*, at pp. 16-17.) That is enough to reject the argument before us.

In the big picture, the majority opinion may be correct that Riverside County's chronic court congestion is a problem that "only the Legislature can correct." (Maj. opn., *ante*, at pp. 20-21.) But I fear the opinion could be read to suggest that all that is needed

9

to support the trial court's finding here is that the county's courts are severely underfunded.  (See Maj. opn, *ante*, at pp. 15-16, 21-22.)  Citing to pending legislation (*id.* at p. 21) that is not relevant to our record-based decision could be read to indicate the courts can do nothing but advocate for sufficient funding assistance.[29]

A fix has not emerged in decades, and, as we await one, the consequence of dismissing criminal cases is dire.  The basketball coach John Wooden advised "do not let what you cannot do interfere with what you can do."[30]  Underfunded or not, the superior court has a continuous duty to grant "considerable preference" to criminal cases.  (*Engram*, *supra*, 50 Cal.4th at p. 1138; see Penal Code section 1050.)  It must "organize" itself so as not to "shortchange the court's criminal caseload."  (*Id*. at p. 1156.)

A fair reading of *Engram* requires the courts to ensure that even if underfunded, they are granting considerable priority (but not absolute priority) to criminal cases.  We have no reason to doubt that the court is doing this.  We should, however, emphasize that continual effort is required, even if handling all criminal cases is impossible.  If the trial

---

[29]  The final four paragraphs of the majority opinion contain an important (and appreciated) disavowal of these interpretations.  This concurrence nevertheless is meant to identify the reasons—apart from statistics that show that the court is underfunded— that bore on whether the court had good cause for dismissing this criminal case for lack of a courtroom, where those non-statistical reasons were the more precise basis for the Presiding Judge's ruling.  While Judge Monterosso stated that what sets Riverside County apart from other counties is the widely recognized fact of "not enough judges," that statement identified a decades-old problem and came after a particularized, and essential, explanation of the reasons why the lack of judges required dismissing—at that time—this criminal case, and the others dismissed with it.

[30]  Wooden, They Call Me Coach (1972) p. 56.

court can do more, it should.  If this issue persists, the court should continue to explain its reasoning; if anything, it would be helpful to do so in yet greater detail.

RAPHAEL

J.